Jaime BLUM, Brij Kapur and James C. Spitsbergen, Appellants in 86–5349,

v.

WITCO CHEMICAL CORPORATION, Appellant in 86–5310.

Nos. 86–5310, 86–5349.

United States Court of Appeals, Third Circuit.

Argued Feb. 23, 1987.

Decided Sept. 2, 1987.

As Amended Oct. 2, 1987.

John M. Esposito (argued), Sobel and Lyon, P.C., East Hanover, N.J., for appellees/cross-appellants.

Samuel D. Bornstein (argued), Bornstein & Sosland, P.A., Paramus, N.J., for appellant.

Before WEIS, BECKER and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal and cross appeal arise out of an age discrimination suit brought by three research chemists against their former employer, Witco Chemical Corporation.[1] The case was tried to a jury which found for the plaintiffs and awarded them a total of $75,057.05 in lost pension benefits under the ADEA and $15,000 for pain and suffering under the New Jersey common law doctrine of wrongful discharge. Plaintiffs were also awarded $135,977.40 in attorney's fees. Witco's appeal from the district court's denial of a motion for a judgment notwithstanding the verdict raises four issues: 1) whether there was sufficient evidence to support the jury's verdict; 2) whether the plaintiffs were entitled to

"front pay" in the form of lost pension benefits under the ADEA; 3) whether there exists a cause of action for wrongful discharge based on age discrimination under the New Jersey common law doctrine of wrongful discharge; and 4) whether the award of attorney's fees was excessive. The plaintiffs' cross appeal raises one issue: whether the district court erred by refusing to award liquidated damages under the provisions of the ADEA.

For the reasons that follow, we conclude that there was sufficient evidence to support a finding of age discrimination, and we will uphold the jury's verdict on that issue. Addressing the important issue of pension benefits, we conclude that the policies underlying the ADEA support the award of lost pension benefits as front pay under the facts of this case. We disagree with the district court on the existence of a New Jersey wrongful discharge claim for age discrimination and will set aside the jury award on that issue. As to attorney's fees, despite misgivings on certain items, we do not find an abuse of discretion in the district court's calculation of the lodestar. However, in the wake of the Supreme Court's recent decision in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, —— U.S. ——, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), we will remand for a recalculation of the 20% risk multiplier employed by the district court. On plaintiffs' cross appeal, we will affirm the district court's order denying to plaintiffs liquidated damages.

## I. FACTS AND PROCEDURAL HISTORY

In April of 1983, pursuant to a planned reduction in force, Witco closed its Central Research Division in Oakland, New Jersey. As a result, seventeen employees of the Division were terminated, while sixteen were retained and reassigned to other divisions in the company. Among the terminated employees were three research chem-

---

**1.** Jurisdiction was founded upon the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634.

ists—Jaime Blum, Brij Kapur and James Spitsbergen. At the time of termination: Blum was sixty years old (he had been employed by the company for nine years); Kapur was fifty-eight years old (he had been employed by Witco for eighteen years); and Spitsbergen was fifty-seven years old (he had been employed by Witco for fifteen years). All three men have graduate degrees in chemistry.

Following their termination each of the plaintiffs secured new employment at a higher salary. Blum found a job in August of 1983 which paid $5,000 more a year than his position with Witco. Kapur's new position paid $4,000 more per year. Spitsbergen's new position paid $6,000 more per year. However, both Blum and Spitsbergen's new jobs were out of state, requiring dual residence and causing commuting expenses.

In August, 1983 Blum, Kapur and Spitsbergen brought suit against Witco charging age discrimination as well as various torts based on state law. In June 1985 the case proceeded to trial.

The plaintiffs attempted to prove their allegation of discrimination primarily through the testimony of an expert: labor economist, Mark Killingsworth. Statistical data that he interpreted revealed that chemists at Central Research who were under forty years of age had a 100% retention rate, while approximately two-thirds of the chemists over forty were terminated. A second analysis, which used the age of forty-five as the dividing line, also showed a disparate termination for chemists who were over forty-five. Additionally, plaintiffs produced a statistical expert who testified that the probability that the disparate retention rate was due to some random factor unrelated to age was .0084 (approximately 8 in 1000).

Plaintiffs introduced evidence that showed that less than three weeks after Witco terminated them, Witco ran an employment advertisement in the New York Times for a chemist at its Argus Division in Brooklyn, New York. Even though all three plaintiffs were still unemployed, and one even applied for the position, Witco hired a twenty-five year old chemist to fill the vacancy. Blum also testified that at a social gathering in March of 1983, a month before his termination, his supervisor had approached him and remarked, "Gee whiz, Dr. Blum, you are getting feisty at your old age."

To support their damage claims, the plaintiffs offered the testimony of William Troyan, who was qualified as an expert in the valuation of retirement and pension programs. Troyan testified that he had evaluated Witco's plan and, based on interest rates and mortality tables provided by the Pension Benefit Guaranty Corporation, had calculated the difference between the present value of Witco's pension plan to each plaintiff at the time of termination and its value had he remained in Witco's employ until the normal retirement age of 65 years old. He testified that Blum would suffer a decrease in monthly pension benefits having a present value of $19,901.44 as a result of the wrongful discharge; Kapur, $30,677.76; and Spitsbergen, $7,637.85.

As its defense, Witco adduced evidence that the chemists were terminated because their areas of expertise were too specialized to make retention elsewhere in the company feasible. Company witnesses testified that the chemists retained by Witco were kept primarily because of their involvement with a particular project at Witco named Argus. Company officials denied that their termination decisions were based on age.

On the issue of damages, Witco offered the testimony of an assistant to the Director of Human Resources for Witco. He testified that he had reviewed the employment packages of the plaintiffs' new employers, and he opined that they were all better packages than Witco's. However, no testimony was offered to contradict the calculations of plaintiffs' expert concerning the amount by which plaintiffs' claim for lost pension benefits should be decreased as a result of these allegedly better total employment packages.

The jury returned a verdict in favor of the plaintiffs, awarding Blum $19,901.44 in lost pension benefits and $5,000 in damages

for pain and mental suffering; Kapur $30,-677.76 in lost pension benefits and $5,000 in damages; and Spitsbergen $7,637.85 in lost pension benefits and $5,000 in damages. Initially, the front pay pension claims were to be tried to the court. However, the district court later decided to submit the pension issue to the jury on the state law claims and to use the verdict as advisory on the ADEA pension claims. After trial, the district court adopted the jury verdict, in light of this court's decision in *Maxfield v. Sinclair Int'l*, 766 F.2d 788 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986), that the amount of a front pay award is a jury question. The district court also denied the defendant's post-trial motions for judgment notwithstanding the verdict and for a new trial, and later granted plaintiffs' motion for attorney's fees, awarding $135,977.40. Witco filed timely appeals from the order denying its motion for judgment n.o.v. and the order awarding attorney fees. The plaintiffs cross appealed. We consider first the issues raised in Witco's appeal.

## II. SUFFICIENCY OF EVIDENCE OF AGE DISCRIMINATION

▪ Witco's first argument on appeal is that plaintiffs failed to prove age discrimination.[2] Because a jury determined the issue, our scope of review is limited to examining whether there is sufficient evidence to support the verdict, drawing all reasonable inferences in favor of the verdict winner. *Massarsky v. General Motors Corp.*, 706 F.2d 111, 117 (3d Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983).

▪ In order to prevail on their age discrimination claim, plaintiffs had to prove that age was a determinative factor in the defendant's decision to terminate their employment. *Duffy v. Wheeling Pittsburgh*

*Steel Corp.*, 738 F.2d 1393, 1395 (3d Cir. 1984). We have set forth the manner in which the burden of proof devolves in other cases, *see Berndt v. Kaiser Aluminum & Chemical Sales, Inc.*, 789 F.2d 253, 256 (3d Cir.1986); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.) (in banc), *cert. dismissed*, —— U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987), and it need not be repeated here. It is noteworthy however that under *Maxfield v. Sinclair Int'l*, 766 F.2d 788 (3d Cir.1985), it is now sufficient to prove more favorable treatment to a "sufficiently younger" person, rather than to a person outside the protected class. *Id.* at 793.

▪ We find, after a careful review of the record, that there was sufficient evidence from which the jury could reasonably have concluded that age was a determinative factor in Witco's decision to terminate the plaintiffs. As noted by the district court, plaintiffs' expert "produced convincing statistical evidence that the chance that the plaintiffs were terminated for non-age-related reasons was almost nonexistent." Statistical evidence is an appropriate method for establishing disparate impact as indirect evidence of age discrimination. *Leftwich v. Harris-Stowe State College*, 702 F.2d 686, 690 (8th Cir.1983); *cf. Massarsky*, 706 F.2d at 121 (absent statistical proof, pure conjecture to assume employer's policy had disparate impact on protected class). Plaintiffs also offered evidence that Witco hired a twenty-five year old chemist to fill a vacancy for which they were qualified, and of an age-related comment made by Blum's supervisor. All this evidence is sufficient to support the jury's determination that impermissible age discrimination was a factor in Witco's decision.

Plaintiffs also introduced evidence to discredit Witco's proffered nondiscriminatory

---

**2.** Witco actually contends that plaintiffs failed to make out a *prima facie* case of age discrimination. Once a case has been fully litigated, however, it is unnecessary for the appellate court to decide whether a *prima facie* case had, in fact, been established. *Berndt v. Kaiser Aluminum & Chemical Sales, Inc.*, 789 F.2d 253, 257 (3d Cir.1986). Rather, the appellate court

must consider the ultimate issue: whether plaintiffs proved by a preponderance of the evidence that age was a determinative factor in the employer's decision to fire the plaintiffs. Thus, we will treat defendant's first argument as addressing the issue of whether there was sufficient evidence to support the jury's verdict of age discrimination.

reason for the terminations. Witco asserted that the chemists retained by Witco were chosen on the basis of time served on the Argus project. On cross-examination of Witco's witnesses, however, plaintiffs demonstrated that the charts purporting to establish the relationship between hours spent on the project and the decision to retain certain chemists were fraught with inconsistencies. Thus, plaintiffs not only introduced sufficient evidence to support the conclusion that age was a determinative factor in Witco's decision, they also successfully discredited Witco's "legitimate" reason for the terminations, showing it to be a mere pretext. *See Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 895 (3d Cir.) (in banc), *cert. dismissed* — U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815, (1987). We will therefore uphold the jury's verdict on the issue of liability under the ADEA.[3]

### III. LOST PENSION BENEFITS AS FRONT PAY

Turning to the issue of damages, we must consider the important question whether front pay in the form of lost pension benefits may be awarded under the ADEA, and if so, whether such an award was proper in this case. In *Maxfield v. Sinclair Int'l.*, 766 F.2d 788, 795–96 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986), we held that front pay is available under the ADEA based on the Act's broad language giving courts the power "to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter...." *Id.* (quoting 29 U.S.C. § 626(b)). "The inclusion of equitable relief strengthens the conclusion that Congress intended victims of age discrimination to be made whole by restoring them to the position they would have been in had the discrimination never occurred." *Id.* at 796.

Employing this make-whole philosophy, we now hold that lost pension benefits are recoverable as front pay under the circumstances presented in this case. We caution, however, that such benefits may not be available where an award would make a plaintiff more than whole, such as where a plaintiff has found subsequent employment at a greatly increased salary that would offset any loss of pension benefits, or where defendant can prove that the new employer's pension plan would provide plaintiff with approximately the same benefit he lost due to the defendant's discriminatory firing.

Back pay coupled with reinstatement is the preferred remedy to avoid future damages in ADEA cases. *Maxfield*, 766 F.2d at 796. The relevant time period for calculating an award of back pay begins with wrongful termination and ends at the time of trial. *Berndt v. Kaiser Aluminum & Chemical Sales, Inc.*, 604 F.Supp. 962, 964 (E.D.Pa.1985), *aff'd*, 789 F.2d 253 (3d Cir.1986). Back pay compensates the plaintiff for loss of past wages, and reinstatement insures that no future losses will accrue due to discrimination. Unfortunately, reinstatement is not always

---

**3.** Witco contends that the jury was confused and the verdict prejudiced by the district court's refusal to admit certain evidence, which the court found cumulative. On cross-examination of plaintiffs' expert, Professor Killingsworth, Witco's counsel asked the witness to prepare a chart to reflect the results in terms of age if Witco had terminated employees on an alphabetical basis. The charts showed that the alphabetical terminations produced virtually the same results as the actual termination in relation to age. The court allowed the testimony and allowed Witco's counsel to comment on it in closing arguments. It did not, however, allow the charts to be introduced into evidence, finding that they were "merely a transcription of what the witness ... said in his testimony," and therefore cumulative. Trial rulings as to the admission of evidence are reviewable only for abuse of discretion. *In re Japanese Electronic Prod.*, 723 F.2d 238, 260 (3d Cir.1983), *rev'd on other grounds, Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We find no abuse in this instance. Neither do we find abuse of discretion in the court's comment during the jury charge. The court could reasonably have believed that its comments were necessary in light of defense counsel's misrepresentation of Professor Killingsworth's testimony. *See United States v. Olgin*, 745 F.2d 263, 268 (3d Cir.1984) (to assist jury in its deliberations, trial judge may comment on evidence).

feasible, *e.g.*, because of irreparable animosity between the parties or, as in this case, because of a reduction in the employer's work force. In such a case, back pay will still defray past losses, but the "alternate remedy" of front pay must be used to make the plaintiff whole for future expected losses. *Maxfield*, 766 F.2d at 796. In calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement.[4] A plaintiff, of course, has a duty to mitigate damages, and his new salary will be deducted from the old to avoid a windfall award.

■ Under the facts presented here, plaintiffs were not entitled to an award of back pay. All three plaintiffs had secured jobs with slightly higher salaries by the time of trial, and severance pay compensated them for the unemployed period. In addition, the "future wages" element of a front pay award was entirely offset by plaintiffs' new salaries. Nonetheless, plaintiffs suffered very real economic injuries as a result of Witco's discrimination. Another element of future damages, expected compensation in the form of pension benefits, was not offset by their new salaries, nor by any deferred compensation plans offered by their new employers. *See infra* at 376. Here, plaintiffs proved a net future loss, despite their mitigation efforts, that would not have occurred but for Witco's unlawful conduct. Awarding future damages in the form of (net) lost

pension benefits under these circumstances serves the ADEA's joint purpose of making plaintiffs whole and deterring future discriminatory acts by employers. *Koyen v. Consolidated Edison Co.*, 560 F.Supp. 1161, 1168 (S.D.N.Y.1983).

Pension benefits, unlike lesser fringe benefits, are an integral part of an employee's compensation package, and indeed are generally referred to as deferred compensation. Because of the paramount importance of pension benefits to an employee's future financial security, it would be unfair to exclude them from a calculation of front pay.[5] *Ventura v. Federal Life Ins. Co.*, 571 F.Supp. 48, 50 (N.D.Ill.1983). An employee illegally discharged near the end of his working career is particularly vulnerable to suffering economic injury in the form of lost pension benefits. If he secures subsequent employment, he will often be unable to work the number of years that are required for vesting under the new employer's pension plan, and thus he will receive no pension benefits for his last few years of employment.[6]

Plaintiffs' expert, William Troyan, made two calculations for the jury. First, he took the actual pension benefits each plaintiff was receiving from Witco and, using the life expectancy and interest rate tables provided by the Pension Benefit Guaranty Corporation, reduced the figure to present value. He then analyzed the salary history of each plaintiff to arrive at an average annual salary increase of 6.45%. Using these salary projections and the PBGC ta-

---

4. The court must decide whether reinstatement is feasible or whether front pay should be awarded in lieu of reinstatement. Once this equitable decision has been made by the court, "the amount of damages available as front pay is a jury question." *Maxfield*, 766 F.2d at 796.

5. We have no occasion to decide today whether lost fringe benefits such as health and life insurance should be included in a front pay award. *Cf. Kolb v. Goldring, Inc.*, 694 F.2d 869, 872–74 (1st Cir.1982) (lost clothing discount and expense account included in back pay award); *Nordquist v. Uddeholm Corp.*, 615 F.Supp. 1191, 1204 (D.Conn.1985) ("entire employment benefit package" considered in future damages award); *Koyen v. Consolidated Edison Co.*, 560 F.Supp. 1161, 1169 (S.D.N.Y.1983) ("financial benefits" other than salary included in front pay award).

6. Statistics show that older workers have far more difficulty finding new jobs than their younger counterparts. In September 1984, 52% of unemployed workers between the ages of 54 and 64 remained unemployed for more than 15 weeks, as compared to 28.4% of unemployed workers between the ages of 25 and 34 and 33.1% of those between 35 and 44 years of age. Note, *Front Pay: A Necessary Alternative to Reinstatement Under the Age Discrimination in Employment Act*, 53 Fordham L.Rev. 579, 590 n. 44 (1984) (citations omitted). When older employees do find work, it is often at a salary much lower than the one they had previously earned. *Id.*

bles, Troyan calculated for the jury the present value of the benefits each plaintiff would have received had he remained at Witco until age 65. The difference between the two figures represents the damages in lost pension benefits due to Witco's unlawful discharge.[7]

Witco had an opportunity to prove a set-off to these damages by reason of benefits received by plaintiffs from their new employers. Although we have held that pension benefits received by a plaintiff from the defendant after an illegal discharge are analogous to a collateral benefit and should not be set off against a back pay award, *McDowell v. Avtex Fibers, Inc.*, 740 F.2d 214, 217–18 (3d Cir.1984), *vacated on other grounds*, 469 U.S. 1202, 105 S.Ct. 1159, 84 L.Ed.2d 312 (1985), pension benefits received from a subsequent employer are simply another form of earned income, which, of course, may be set off from a front pay award consistent with plaintiff's duty to mitigate damages. Witco, however, failed to carry its burden of proving a set-off. *Rodriguez v. Taylor*, 569 F.2d 1231, 1243 (3d Cir.1977) (burden is on defendant on the issue of any set-offs to damages), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed. 2d 414 (1978).

Witco's employee, Harold Miller, testified as to the retirement benefit each plaintiff was receiving from Witco. He then reviewed the retirement plans of the plaintiffs' new employers. Blum's employer, Acolac, had no pension plan. Spitsbergen's employer, Unitrue, had no pension plan, but did have a profit-sharing plan. Miller testified that, depending on whether the company made a profit, Spitsbergen could receive some retirement income from his new employer. Miller also testified that Kapur's new employer, Colgate-Palmo-

live, had a retirement plan similar to Witco's in which Kapur was eligible to participate after one thousand hours of employment. Kapur's benefits under the plan would not vest, however, until he had accumulated ten years of service with his new employer, which would be some three years after his normal retirement age. Defendant's Exhibit 18, App. at 647. Witco did not attempt to set off any net increases (after expenses) in earnings against reduced pension benefits.

Thus, there was sufficient evidence in the record from which the jury could conclude that plaintiffs suffered lost pension benefits in the amounts testified to by Troyan, see note 7, *supra*, and that these losses were not offset by the higher salaries or pension plans offered by the plaintiffs' new employers. We therefore see no reason to set aside the jury's award.

We are aware that the speculative nature of future damages has been cited as a reason for denying such awards. *See, e.g., Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013 (1st Cir.1979). However, we agree with the court in *Koyen*, 560 F.Supp. at 1168–69, that "the problem is more imaginary than real." Courts and juries have been calculating future damage awards in personal injury cases for years. In the present case, the uncertainty was diminished by the fact that all three plaintiffs were re-employed by the trial date, leaving little question as to their future earnings and benefits. *Cf. E.E.O.C. v. Prudential Fed. Sav. & Loan Ass'n*, 741 F.2d 1225, 1232 (10th Cir.1984) (uncertainty not relevant consideration where court granted only future pension benefits, not future wages). The only remaining variable is that a future damage equation assumes that the plaintiff would have remained with the em-

---

7. Plaintiffs' exhibits P–27, P–28 and P–29 summarize Mr. Troyan's calculations.

|  | Actual Pension Benefit | | Projected Pension Benefit at Age 65 | | Net Difference |
|---|---|---|---|---|---|
|  | Per Month | Present Value | Per Month | Present Value | Present Value |
| Blum | $199.45 | $18,364.80 | $661.19 | $38,266.24 | $19,901.44 |
| Kapur | 435.62 | 41,517.37 | 1,524.03 | 72,195.13 | 30,677.76 |
| Spitsbergen | 322.75 | 31,633.50 | 984.57 | 39,271.35 | 7,637.85 |

ployer until normal retirement age, absent the illegal termination. *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1101 n. 8 (8th Cir.1982). Since the plaintiffs were all within eight years of normal retirement age when terminated by Witco, this assumption does not require unreasonable speculation. *See Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 923 (6th Cir.1984) (award of front pay to 41–year old until normal retirement age might be unwarranted while failure to make such an award to 63–year old might be abuse of discretion).

## IV. THE PENDENT STATE WRONGFUL DISCHARGE CLAIM

In addition to a front pay award, the jury awarded $5,000 to each plaintiff for pain and suffering and $1,840 to Blum for medical expenses. We have held that such damages are not recoverable under the ADEA. *Rogers v. Exxon Research & Engineering Co.*, 550 F.2d 834 (3d Cir.1977), *cert. denied*, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 770 (1978). The issue of pain and suffering, however, was also submitted to the jury in connection with plaintiffs' pendent state law claim for wrongful discharge.

█ The New Jersey Supreme Court has not addressed the question whether a tort cause of action exists for age discrimination in employment. "In the absence of an authoritative pronouncement from the state's highest court, the task of a federal tribunal is to predict how that court would rule." *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1981). The district court predicted that the New Jersey courts would allow a cause of action for wrongful discharge based on age discrimination. This prediction is a determination of law and is reviewable by us under the plenary review standard. *Compagnie Des Bauxites v. Ins. Co. of North America*, 724 F.2d 369, 371–72 (3d Cir.1983). We will do so by examining the policies underlying New Jersey's wrongful discharge doctrine and its application in other cases.

In *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980), the New Jersey Supreme Court carved out a public policy exception to the employment at will doctrine. The court held that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Id.* at 72, 417 A.2d 505. The pronouncement was made in the context of an alleged retaliatory firing. The court limited its apparently broad holding by stating that "unless an employee at will identifies a specific expression of public policy [that he was discharged for refusing to violate], he may be discharged with or without cause." *Id.*

In *Lally v. Copygraphics*, 85 N.J. 668, 428 A.2d 1317 (1981), the New Jersey Supreme Court allowed a civil cause of action for wrongful discharge based on a retaliatory firing after the plaintiff filed a worker's compensation claim. A New Jersey statute declared such firings illegal and provided both penal sanctions and administrative relief. *Id.* at 670, 428 A.2d 1317 (citing N.J.S.A. 34:15–39.1 and 39.2). The court reasoned that these statutory remedies did not preempt but rather would be complemented by a civil right of redress. *Id.* at 671, 428 A.2d 1317.

█ The case at bar is not one of retaliatory discharge. Although discharging an employee based on age discrimination would violate the "clear mandate of public policy" as announced by New Jersey's Law Against Discrimination, N.J.S.A. 10:5–1, *et seq.* (NJLAD), no New Jersey court has specifically held that a wrongful discharge tort claim can be maintained in such a case. Moreover, plaintiffs here, unlike those in *Pierce* and *Lally*, have avenues for relief under comprehensive and parallel state and federal statutes. Under the NJLAD plaintiffs have the option of seeking administrative relief through the Division of Civil Rights or of filing suit in the New Jersey Superior Court. NJSA 10:5–13; *Christian Bros. Institute of New Jersey v. Northern New Jersey Interscholastic League*, 86 N.J. 409, 432 A.2d 26 (1981). Damages for pain and suffering, unavailable under the

ADEA, have been awarded under NJLAD. *Andersen v. Exxon Co. U.S.A.,* 89 N.J. 483, 446 A.2d 486 (1982).

Given the comprehensive remedies available under the state and federal statutes, we find it unlikely that New Jersey would expand its wrongful discharge doctrine, which is a narrow exception to the employment at will rule, to include an action for age discrimination. In *Bonham v. Dresser Indus.,* 569 F.2d 187, 195 (3d Cir.1977), we expressed doubt that the mere passage of a state age discrimination statute "created a separate common law claim where none had existed before and where that void had been filled by that very legislation." *See also Bruffett v. Warner Communications, Inc.,* 692 F.2d 910 (3d Cir.1982) (refusing to predict that Pennsylvania would create common law cause of action for discriminatory discharge where state statutory remedies were available).

In view of these authorities, and of the absence of a clear declaration from the New Jersey legislature or judiciary, we decline to open the federal forum to this cause of action. We therefore will set aside the jury's award of $5,000 to each plaintiff for pain and suffering and $1,840 in medical bills to Blum.

## V. ATTORNEY'S FEES

Plaintiffs, having prevailed on the merits, are entitled to an award of attorney's fees for the time expended on their ADEA claims.[8] 29 U.S.C. § 626(b). The district court awarded fees based on an hourly rate of $100 per hour for 1983 and 1984 and $125 per hour for 1985 and 1986.[9] The court found the number of hours claimed to have been expended by plaintiffs' counsel reasonable and allowed recovery for 1009.9 hours, excluding only those hours spent exclusively pursuing state law claims (122.5 hours). The court then increased the lodestar amount by 20% because of the contingent nature of the case and the delay

in payment of fees. The total amount of the fee award was $135,977.40.

The district court awarded such fees on the basis of detailed affidavits of services submitted by plaintiffs' counsel and opposing affidavits submitted by Witco. Witco objects to (1) the award of fees without an evidentiary hearing; (2) the reasonableness of the number of hours on which the award was based; and (3) the 20% increase in the lodestar amount awarded by the district court because of the contingent nature of the litigation and the delay in payment.

█ The district court's failure to conduct an evidentiary hearing on this matter is not reversible error. As we have warned, the inquiry into the proper fee should not "assume massive proportions ... dwarfing the case in chief." *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 116 (3d Cir.1976) (in banc). *See also Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983); *Boston & Maine Corp. v. Moore,* 776 F.2d 2, 10 (1st Cir.1985); *Gotches v. Heckler,* 773 F.2d 108, 110 (7th Cir.1985); *Copeland v. Marshall,* 641 F.2d 880, 903 (D.C.Cir. 1980). Many fee applications are decided on the basis of affidavits without the need for a hearing. *See, e.g., Trucks, Inc. v. United States,* 763 F.2d 339, 341 (8th Cir. 1985); *Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 910 n. 22 (3d Cir.1985); *Sims v. Flanagan,* 756 F.2d 4, 6 (3d Cir.1985); *Environmental Defense Fund, Inc. v. Lamphier,* 714 F.2d 331, 340 (4th Cir.1983); *National Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1330 (D.C.Cir. 1982). *See also* 3 M. Derfner & A. Wolf, *Court Awarded Attorney Fees* ¶ 26.01 (1986). A hearing must be held only where the court cannot fairly decide disputed questions of fact without it. *National Ass'n of Concerned Veterans,* 675 F.2d at 1330; *Herrera v. Valentine,* 653 F.2d 1220,

---

**8.** Plaintiffs are not entitled to and were not awarded fees for time spent exclusively pursuing state law claims since we have set aside the jury's verdict on those claims.

**9.** Witco does not challenge the reasonableness of the hourly rates.

1233 (8th Cir.1981); *Detroit v. Grinnell Corp.*, 495 F.2d 448, 473 (2d Cir.1974).

■ In the case at bar, several detailed affidavits describing counsel's labors were filed with the court, listing the time spent on each matter and its relation to the case. *See* App. at 223–57. Witco sought no discovery on the fee issue. Neither did it identify for the court any factual dispute or pinpoint any specific area where a hearing would have been helpful. Rather, defendant's counsel simply challenged the fee request on the grounds of reasonableness of the number of hours billed, particularly objecting to hours billed in connection with unsuccessful motions and depositions that were never used at trial. However, the Supreme Court has rejected the notion that the fee award should be reduced "simply because the plaintiff failed to prevail on every contention raised in the law suit." *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1982). The mere failure of certain motions or the failure to use depositions is insufficient to warrant a fee reduction under *Hensley*. Because Witco's chief objection was erroneous as a matter of law, further factual development through an evidentiary hearing was unnecessary. In addition, having tried the case, the district court was intimately acquainted with the case and the scope of preparation of both parties and was therefore well equipped to assess the reasonableness of the hours expended based on the affidavits alone.

■ Turning to Witco's second objection, reasonableness of the hours billed, our scope of review is narrow: if the district court applied the correct legal standard, this court may alter the award only if the district court abused its discretion. *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 923 (8th Cir.1986); *Jones v. Board of Governors*, 790 F.2d 1120 (4th Cir.1986); *Zabkowicz v. West Bend Co.*, 789 F.2d 540, 549 (7th Cir.1986); *Jones v. Continental Corp.*, 789 F.2d 1225, 1229 (6th Cir.1986); *Ursic v. Bethlehem Mines*, 719 F.2d 670, 674–75 (3d Cir.1983). In determining what hours are reasonably expended on the suit, "the most critical factor is the degree of success ob-tained.... Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley*, 461 U.S. at 435–36, 103 S.Ct. at 1940–41.

The district court awarded plaintiffs' attorneys' fees for 1009.9 hours on the ADEA claim. It disallowed only the 122.5 hours spent exclusively pursuing state law claims. As noted above, the court properly denied defendant's request to eliminate hours spent on unsuccessful motions and on discovery of evidence that was ultimately not used at trial. *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. The district court also rejected Witco's argument that the plaintiffs' affidavit reflected excessive billing because it included numerous hours spent in consultation between trial counsel and other attorneys in counsel's firm, in "organizing" and "reorganizing" the file, and in telephone conversations between counsel and the plaintiffs. We are reminded by the Supreme Court that a fee applicant should "exercise 'billing judgment' with respect to hours worked." *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941. "Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Id.* at 434, 103 S.Ct. at 1939–40. This "billing judgment" does not necessarily mean that counsel should not be compensated for all hours spent on the case, "but the hours he does seek compensation for must be *reasonable.*" *City of Riverside v. Santos Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 2692 n. 4, 91 L.Ed.2d 466 (1986) (emphasis in original). The district court found the above-mentioned activities reasonable and included them in calculating the fee award.

We are troubled by the considerable amount of time charged to "organization" and "reorganization" of the file, and by the large number of hours billed by senior counsel for consultation with other counsel in the firm. We do not doubt that good housekeeping is essential to efficiency, and that good file organization is essential to

intelligent presentation of a case. However, the hours claimed here seem excessive. Although we urge the district courts to be wary of such claims, we will defer to the district court's discretion in this case. We will likewise defer with respect to the hours claimed for consultation with other lawyers, but with the same caveat. We can understand the need for extensive consultation by junior counsel, but not by senior counsel, whose hours are billed here, and we urge the district courts to scrutinize such claimed hours with care.

Finally, Witco objects to the district court's use of a 20% multiplier, increasing the fee award to a total of $135,977.40. The court found that this case warranted an upward adjustment "due to the contingent nature of the litigation and due to the delay in payment of fees." App. at 491. While we agree that both may be legitimate reasons for increasing the lodestar amount, *see Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* — U.S. —, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (*DVCCCA II*); *Institutional Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 922–23 (3d Cir.1985), we cannot uphold their application on this record.

The Supreme Court's recent decision in *DVCCCA II* controls our review of the risk multiplier.[10] A majority of the Supreme Court (Justices O'Connor, Blackmun, Brennan, Marshall and Stevens) held that "Congress did not intend to foreclose consideration of contingency in setting a reasonable fee under fee-shifting [statutes]." However, the Justices agreed that "compensation for contingency must be based on the difference in market treatment of contingent fee cases *as a class,* rather than on an assessment of the 'riskiness' of any particular case." — U.S. at —, 107 S.Ct. at 3089 (O'Connor, J., concurring) (emphasis in original). A different majority (the Chief Justice, Justices White, Powell, Scalia and O'Connor) further held that "no enhancement for risk is appropriate unless the applicant can establish that without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.' " — U.S. at —, 107 S.Ct. at 3091 (O'Connor, J., concurring, quoting Justice White at —, 107 S.Ct. at 3089–91).[11]

The district court could not have anticipated and did not employ the approach the Court adopted in *DVCCCA II.*[12]

**10.** Although *DVCCA II* concerned a fee award under section 304(d) of the Clean Air Act, 42 U.S.C. § 7604(d), the Court's holding addressed fee-shifting statutes in general. — U.S. at —, 107 S.Ct. at 3080–81.

**11.** Justice O'Connor served as a swing vote between two opposing viewpoints. On one hand, she joined with Justice White, the Chief Justice, Justices Powell and Scalia to form a majority for reversing the district court's risk enhancement of the lodestar under the facts of the case. Justice White, joined by the Chief Justice and Justices Powell and Scalia concluded that enhancement of the lodestar fee "to compensate for assuming the risk of loss is impermissible under the usual fee-shifting statutes." *Id.* at —, 107 S.Ct. at 3087. They also found that, even assuming that employing a risk multiplier is permissible in some instances, it was error to employ it in that case. Because the case concerned only fees for work done after a consent decree was entered, there was little risk that the district court would not enforce its own order. Justice O'Connor concurred with these four as to the inappropriateness of a multiplier in that case and joined them in reversing the district court's award.

On the other hand, Justice O'Connor did not adopt the position of those four that risk multipliers are always impermissible. She agreed with Justices Blackmun, Brennan, Marshall and Stevens that a risk multiplier may be employed when based on the premium for contingency that exists in the prevailing market rather than on the particular risks in the case. She further noted that, in order to avoid "haphazard and widely divergent" results, determinations of how a particular market compensates for risk should be treated as controlling in all future cases involving the same market. — U.S. at —, 107 S.Ct. at 3090.

Justices Blackmun, Brennan, Marshall and Stevens would have gone further in determining the proper contingency enhancement. First, they would have the district court determine whether the attorney was able "to mitigate the risk of nonpayment in any way." — U.S. at —, 107 S.Ct. at 3098. Second, they would inquire "whether specific aspects of the case have aggravated [the] economic risk," *id.,* such as delay in payment, the extra risk encountered by smaller firms, and, in exceptional cases, the "legal" risks involved in a particular case. — U.S. at —, 107 S.Ct. at 3099. Justice O'Connor did not agree with Justices Blackmun, Brennan, Marshall and Stevens on these points, and a majority of the Court opposes this position.

**12.** First, it is clear from the district court's opinion that the court enhanced the lodestar fee

It must now calculate any contingency multiplier in accordance with that opinion. Beyond determining the appropriate delay factor, however, that is a daunting task indeed. The 4–1–4 division makes it difficult to identify the reasoning or derive guidance from the various alliances the court formed to reach its holdings. In addition, the opinions themselves, insofar as they add up to five votes on the critical points, do not present clear mandates. Most difficult of all, the district court must tackle the task of translating the court's message into a blueprint for an evidentiary hearing, and make findings that will satisfy the *DVCCCA II* rule. Although we could pretermit this discussion and merely remand the counsel fee question to the district court for further consideration in light of *DVCCCA II*, awaiting development of a full record in this or some other case on appeal before coming to grips with some of the difficult problems that *DVCCCA II* poses, bearing in mind that counsel fee litigation is daily fare these days, our concern for the problems that will be faced day in and day out by the district judges within the circuit in the wake of *DVCCCA II* compels us to say something on the issue now. We will, therefore, try to give some guidance and to identify some important issues and suggest ways that a record might be developed.

First, five justices agree that the novelty and difficulty of issues cannot be the basis for a contingency multiplier, and that, whatever the standard may be, specific findings by the district court are required to justify any contingency multiplier (Justices White, Powell, Scalia, O'Connor and the Chief Justice). At least five justices have indicated through the tenor of their opinions that the plaintiff has a significant burden to carry to justify a contingency multiplier.[13] Accordingly, the plaintiffs must develop an evidentiary presentation on remand. If they fail, they must suffer the proverbial "Scotch verdict"—"not proven."

Second, the presentation required by *DVCCCA II* will most certainly require expert testimony from someone familiar with the economics of the legal profession. It may also be that an expert economist will be required, even one able to develop some kind of econometric model. In such event, it would be helpful if we could identify just what type of econometric model would be necessary. Justice O'Connor's emphasis on the significance of contingency *per se* suggests that an award of a multiplier might have to be based on an econometric model that determined the mathematical relationship between hourly rate and contingency.[14]

based on the risks unique to the particular case rather than on the market treatment of the contingency cases as a class. The court stated that "[a]lthough plaintiffs did ultimately present a very strong case of discrimination . . ., it rested in substantial part on statistical analyses done by plaintiffs' expert using data obtained only through discovery. Thus, the outcome was by no means clear at the outset of the litigation, and there was some risk involved for plaintiffs' counsel."

Second, because the court did not specify how much of the multiplier was awarded for delay as opposed to risk, we must remand for a recalculation of the multiplier as a whole. None of the justices in Delaware Valley Citizens' Council for Clear Air II found an adjustment for delay inconsistent with the fee-shifting statutes, although the dissent viewed delay as a component of contingency. —— U.S. at ——, 107 S.Ct. at 3098–99 (Blackmun, J., dissenting). Although risk and delay are "often mentioned in the same breath," they are distinct issues warranting separate calculation. *Id.* at ——, 107 S.Ct. at 3082.

**13.** It may be that the plurality is sending a message similar to its message in *Delaware Valley Citizens' Council for Clean Air I*, 478 U.S. ——, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), which dealt with the quality multiplier and made clear that it should be awarded only in the most exceptional cases. Such an approach would have been more manageable than what the Court may be asking the district courts to do, and the task of the district courts would have been simpler had it been adopted.

**14.** Such a study would compare the total income earned by lawyers in many different cases, divided by the number of hours worked in each case, to estimate a value for B in the following equation:

$$\text{hourly rate} = F + BC$$

where F represents all other determinants of a lawyer's hourly rate and C is a variable equal to

Performance of such a study would inevitably run into the tens of thousands of dollars, and there would thus be few cases in which the value of the multiple would justify plaintiff's lawyers in investing in such research.

Even more problematic is the fact that such a study would address only one side of Justice O'Connor's inquiry, for it says nothing about the question whether the multiple is necessary to attract competent counsel. — U.S. at ——, 107 S.Ct. at 3089–90. How that question is to be answered—short of estimating the supply curve for plaintiff's legal services in these cases—is equally unclear. An econometric answer here would also be extremely expensive. The district court may wish to consider whether such studies are feasible and whether there are alternatives that will meet the *DVCCCA II* test.

Third, the task of the expert will not be a simple one. It does not appear that Justice O'Connor, who supplied the critical vote, contemplated that the class of cases to be studied be anything less than all contingency cases in a given geographic market, including personal injury cases, which constitute the biggest group. While a larger sample may produce better survey results, we fear that inclusion of contingency cases in which a successful attorney is not compensated on a lodestar basis as is the plaintiffs' attorney here, will skew the calculation upward. Despite a smaller sample, the limitation of the class to the genre of case involved (e.g., ADEA cases, civil rights cases, etc.) would appear, at first blush, to be more manageable and reflective of the highly individualized markets. The problem with that approach, however, is that these types of cases are never compensated on a straight contingency and hence there is no relevant market for comparison.

Fourth, Justice O'Connor's opinion makes clear that the district court's determination of how the market compensates for contingency in this case will control future cases involving the same market. — U.S. at ——, 107 S.Ct. at 3089–90. In light of this, perhaps the district court will wish to appoint a special or even a standing master to develop findings about contingency cases in its geographic area that can be used in all cases, or at least as a point of departure. In addition, perhaps intervenors or amici—other lawyers or litigants involved in contingent fee litigation in this market—should be invited to participate, given that the contingency determination may bind them in future cases. —— U.S. at ——, 107 S.Ct. at 3090.[15] If so, there may be a due process problem if they are not involved. In any event, they may be able to contribute to the solution to the problem.

Fifth, while focus on the class of cases, as opposed to the risks of the individual case at issue, may make good theoretical sense, given the plurality's approach, it may be difficult to apply. Lawyers and judges are used to focusing on risks of a given case. Since the difficulty of an individual case is factored out, the universe of factors that make a class of cases more risky is smaller,[16] and in some areas it may be that the expert will conclude that no contingency is necessary to draw lawyers to cases *as a class*, given the availability of the lodestar. On the other hand, the pure market approach suggested by Justice O'Connor, despite its theoretical integrity,

---

1 if the case is compensated on a contingency basis and 0 if it is not. The coefficient B would indicate the impact of the fact of contingency *per se* on the lawyer's hourly rate. The pure mathematics of this kind of analysis dictate that B could be either positive or negative (or 0 if there were no relationship at all between contingency and a lawyer's hourly rate), but the Justices seem to agree in their assumption that B will be positive, so that the fact of contingency *per se* increases a lawyer's hourly rate.

**15.** Justice O'Connor wrote that:

"If the concept of treating contingency cases as a class is to be more than symbolic, a court's determination of how the market in a community compensates for contingency should not vary significantly from one case to the next.... District Courts and Courts of Appeals should treat a determination of how a particular market compensates for contingency as controlling future cases involving the same market."

**16.** Such factors will still exist—some kinds of cases may be considered undesirable or expensive to handle, etc.

may result in too high a multiplier. Justice O'Connor's conclusion that any difference in fee structures of contingency versus assured hourly rate cases must be reflected in an upward adjustment of the lodestar should be tempered by the consideration of the fee necessary to attract competent counsel. The mere fact that a difference exists in fee structures does not mean that lawyers will not be attracted to fee-statute contingency cases, given the availability of the lodestar without an enhancement.

We hope and trust that the foregoing discussion will be of some value to the district courts as they grapple with the issues raised by *DVCCCA II*. Whether our offerings grant guidance or comfort or neither, only time will tell. At all events, we will set aside the district court's counsel fee award and remand it for reconsideration (including further testimony) in light of *DVCCCA II* and this opinion.

## VI. LIQUIDATED DAMAGES

The jury found Witco's actions to be willful.[17] Plaintiffs cross appeal from the district court's refusal to award liquidated damages under § 626(b) of the ADEA, which provides that liquidated damages shall be payable in cases of willful discrimination. Although the jury found Witco's action willful, the court found that the award of lost pension benefits as front pay was not subject to the liquidated damages provision. App. at 387. The court reasoned that the purpose of the statute, which essentially doubles the award of back pay, is to ensure that plaintiffs are compensated for the loss due to *delay* in receiving back wages. *Id.* at 388 (citing *O'Donnell v. Georgia Osteopathic Hospital, Inc.*, 748 F.2d 1543, 1552 (11th Cir. 1984)). Since the jury awarded only prospective pension benefits and no back pay, there was no delay involved.

We will uphold the district court's decision, although we do so for different reasons than those set out in the district court opinion. We agree that one purpose of a liquidated damage award is to compensate the plaintiff for the delay in receiving back pay and benefits. However, liquidated damages are also punitive in nature, intended to deter future violations. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125, 105 S.Ct. 613, 623–24, 83 L.Ed.2d 523 (1985). Those punitive aspects would be served by awarding liquidated damages based on both back pay and prospective damage awards. Nevertheless, no court of appeals has allowed front pay (or front benefits) to be included in the liquidated damage calculation.[18] We also decline to do so in this case.

Liquidated damages are described as an amount equal to the amount deemed to be "unpaid minimum wages or ... unpaid overtime compensation." Fair Labor Standards Act, 29 U.S.C. § 216(b) (incorporated by reference in ADEA, 29 U.S.C.

---

**17.** One of our recent cases casts doubt on the finding that Witco's action was "willful." In *Dreyer v. Arco Chemical Co.*, 801 F.2d 651 (3d Cir.1986), we struggled with the definition of "willful" in an ADEA case and concluded that even though an employer knew or should have known that it was violating the Act, "in order that the liquidated damages be based on evidence that does not merely duplicate that needed for the compensatory damages, there must be some *additional evidence of outrageous conduct.*" *Id.* at 658 (emphasis added). Witco's actions, although unlawful, do not seem "outrageous." Just as in *Dreyer*, Witco was unquestionably involved in a reduction in force, and discriminated on the basis of age as to those employees terminated, but it did not eliminate the plaintiffs' jobs merely to purge old people from the work force. *See Dreyer*, 801 F.2d at 658. However, because Witco does not appeal the jury's verdict of willfulness, we need not reach the issue on this appeal.

**18.** In *Blim v. Western Elec. Co.*, 496 F.Supp. 818 (W.D.Okla.1980), the district court awarded liquidated damages on back and front pay without explaining its reasons for doing so. The Tenth Circuit reversed the front pay award because it found reinstatement the more appropriate remedy, never reaching the issue of including front pay in the liquidated damage calculation. 731 F.2d 1473, 1479 (10th Cir.), *cert. denied*, 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984). In *O'Donnell v. Georgia Osteopathic Hosp., Inc.*, 574 F.Supp. 214 (N.D.Ga.1982), the district court awarded liquidated damages on the back pay award but refused to award liquidated damages on front pay. The Eleventh Circuit reversed on other grounds, vacating the liquidated damage award without comment on the front pay-liquidated damages issue. 748 F.2d 1543 (1984).

§ 626(b)). In this case, there was no back pay or lost future wages on which to base a liquidated damage award. The only award plaintiffs received was for lost future pension benefits. This relief, although compensatory, was actually equitable in nature. A front pay (or, in this case, front benefits) award is the monetary equivalent of the equitable remedy of reinstatement. *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 796 (3d Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986); *O'Donnell,* 574 F.Supp. at 223. Given its tenor, we decline to extend the liquidated damages provision of the ADEA to double this equitable award.

## VII. CONCLUSION

For the foregoing reasons, we will affirm the district court's denial of defendant's motion for judgment n.o.v. on the issue of age discrimination. We will affirm the district court's award of front pay in the form of lost pension benefits. We will reverse the district court's judgment and vacate the jury award on the state wrongful discharge claim for age discrimination. We will affirm the award of attorney's fees to the extent of the lodestar, $113,314.50 (502a). However, we will vacate the award of a contingency multiplier (for risk of loss and delay) and remand that aspect of the matter for reconsideration consistent with this opinion and the opinion of the Supreme Court in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* — U.S. ——, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). And on plaintiffs' cross-appeal, we will affirm the district court's denial of liquidated damages.