

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-22-1994

# Feldman v. Phila. Housing Auth. al.

Precedential or Non-Precedential:

Docket 93-1977

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Feldman v. Phila. Housing Auth. al." (1994). *1994 Decisions.* Paper 226.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/226

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Docket Nos. 93-1977, 93-1978, 93-2115, 93-2129, 93-2139

_____

JAMES C. FELDMAN,

v.

THE PHILADELPHIA HOUSING AUTHORITY;
JONATHAN A. SAIDEL, individually and as
Chairman of the Board of Commissioners
of the Philadelphia Housing Authority;
JOHN PAONE, individually and as
Executive Director of the
Philadelphia Housing Authority;
PEGGY JONES; CLAYTON CARTER, JR.,;
NELLIE REYNOLDS; COURTNEY C. SMITH, JR.,
individually and as members of the
Board of the Philadelphia Housing Authority

> Jonathan A. Saidel, in his
> individual capacity,
>
>> Appellant in Nos. 93-1977
>> and 93-2129
>
> John Paone,
>
>> Appellant in No. 93-2115
>
> Philadelphia Housing Authority,
> Jonathan A. Saidel and
> John Paone, in their official
> capacities,
>
>> Appellants in Nos. 93-
>> 1978
>>
>> and 93-2139

_____

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil No. 91-cv-05861)

_____

_____

Argued June 20, 1994

BEFORE:  STAPLETON, GARTH, and PRATT, <u>Circuit Judges</u>*

(Opinion filed December 22, l994)
(Corrected as of December 30, 1994)

_____

Alan Klein  (Argued)
Barry H. Boise
Cohen, Shapiro, Polisher,
  Sheikman & Cohen
PSFS Building - 22nd Floor
12 South 12th Street
Philadelphia, PA  19107

    Attorneys for Appellant
    Jonathan A. Saidel


Robert J. Sugarman  (Argued)
Sugarman & Associates
Robert Morris Building, 7th Floor
100 N. 17th Street
Philadelphia, PA  19103

    Attorney for Appellant
    John Paone


Jerome J. Shestack  (Argued)
Joseph C. Crawford
Jonathan D. Wetchler
Wolf, Block, Schorr &
  Solis-Cohen
12th Floor Packard Building
15th and Chestnut Streets
Philadelphia, PA  19102

    Attorney for Appellants
    Philadelphia Housing Authority,
    Jonathan Saidel, and John Paone
    (the latter two in their
    official capacities)

_____

* Honorable George C. Pratt, United States Circuit Judge for the Second Circuit, sitting by designation.

                                    Joseph F. Lawless, Jr.  (Argued)
                                    6 Harvey Lane
                                    Newtown Square, PA  19073

                          Attorney for Appellee

---

OPINION OF THE COURT

---

PRATT, Circuit Judge:

## INTRODUCTION

Plaintiff James C. Feldman claims the defendant Philadelphia Housing Authority ("PHA"), through its agents, defendants Jonathan A. Saidel and John Paone, violated the First and Fourteenth Amendments of the Constitution of the United States, as well as the State of Pennsylvania's "whistleblower" statute, by firing him in retaliation for publishing reports that exposed wrongdoing at PHA.  After a jury trial the district court entered judgment for plaintiff on all claims, awarding him $616,696 in compensatory damages and a total of $20,000 in punitive damages.  Defendants appeal.  We affirm.

## FACTS AND BACKGROUND

Since the jury found for Feldman, we view the facts by drawing from the evidence all reasonable inferences in his favor.

Defendant PHA, a public agency responsible for providing housing for low-income citizens, is the largest housing agency in Pennsylvania and fourth largest in the United States. The agency is governed by a board of commissioners consisting of five members, two each being appointed by the mayor and the city controller, respectively, with the fifth member being selected by the four appointees.

In January 1990 Saidel, exercising his authority as Philadelphia's city controller, appointed himself to the board of commissioners. Three months later, Paone was named as PHA's new executive director, responsible for overseeing the day-to-day activities of the agency. Paone and Saidel worked closely together, routinely discussing the daily management and affairs of PHA.

Feldman had been working at PHA since 1982. From May 1990 until his termination on May 3, 1991, Feldman acted as the director of the agency's Internal Audit Department. In this capacity, Feldman was responsible for investigating, identifying, and exposing waste, inefficiency, fraud, and criminal activity within PHA. In order to carry out this function, Feldman regularly prepared detailed reports of his investigations. Under the internal-audit charter, which specifies the responsibilities of the Internal Audit Department, Feldman was required to present his findings and observations to the executive director and the board of commissioners, i.e. to Paone, as executive director; and to Saidel, as chairman of the board of commissioners as well as to the four other members of the board.

For most of Feldman's career at PHA, his work was considered exemplary. His personnel file contained no reprimands or comments concerning poor job performance. His last performance evaluation, dated April 24, 1990, gave Feldman a rating of "SUPERIOR". However, after Saidel became chairman of the board and Paone became executive director, things changed. In several of his reports on PHA's management and operations over approximately the next twelve months, Feldman revealed numerous improprieties in several key areas at the agency. As required by the internal auditing charter, Feldman made his reports to Paone, Saidel, and the rest of the board. Many of his reports criticized the job PHA's management was doing. On several occasions, Paone and Saidel reprimanded Feldman for preparing the critical reports.

Paone was particularly displeased with Feldman after he reported that management had promoted a PHA employee who was under investigation for corruption. As a result of a tip, the Internal Audit Department had conducted an investigation of PHA's Central Maintenance Department. The investigation revealed that the Central Maintenance Department, which was responsible for the agency's fencing contracts, was involved in an illegal bid-rigging scheme, and several PHA employees were linked to the unlawful activity. Feldman periodically reported to Paone and Saidel on the details of this investigation, including which PHA employees were probably involved. Ultimately, Feldman reported that one of the implicated employees had been promoted despite being under the continuing investigation. Paone challenged

Feldman, saying, "I thought you were on our side".  Paone then instructed Feldman to remove from his report the reference to the mid-investigation promotion.  Feldman complied.

Later, after Feldman circulated a quarterly report to the board that criticized certain other managerial decisions, Paone and Saidel separately reprimanded Feldman and instructed him that in the future he was to report his findings to Paone only.  Feldman refused to yield to this direction, because it was contrary to the internal-audit charter, and he continued to circulate his reports to the entire board.

The last matter that Feldman worked on that was to be circulated to the board was a human-resources audit.  The purpose of the audit was to determine if PHA management was using its employees in an efficient and economical manner.  Feldman had routinely advised the board and Paone of the progress of the audit.  The final audit report would have revealed favoritism and other improprieties in personnel decisions made by Paone and Saidel.  In general, the audit was very critical of the manner in which PHA was being run.

Around the same time, however, Paone and Saidel were portraying their management of PHA to the public in a different light.  Saidel prepared a "Letter from the Chairman" that was featured in PHA's 1991 annual report.  The letter stated that although the agency had previously been "financially floundering", when he became chairman and Paone became executive director, "[t]hings had to change fast -- and they did".  He went on to say that the board of commissioners "began to reorganize

PHA management and restore the Authority to a viable condition". Moreover, in the "Letter from the Executive Director", also featured in the annual report, Paone said that PHA's greatest challenge was "to win the hearts, minds and respect of our residents and to develop a team approach with them in resolving other major issues".  Had it been published, Feldman's human resources audit report would have severely undercut the annual report's glowing portrayal of management's success.

The same day the human-resources report was to be circulated to the board, Paone, after conferring with Saidel, fired Feldman.  He told Feldman that, effective immediately, his services were no longer needed, because the agency had decided to reorganize the Internal Audit Department.  Feldman was then promptly escorted out of his office by two police officers, without being given an opportunity to retrieve his work or publish the audit report.

Four months later, Feldman instituted this action in district court against PHA, Paone, and Saidel, and against other PHA board members who were dismissed from the action as defendants at the completion of plaintiff's case-in-chief. Feldman alleged that defendants had fired him for "whistleblowing" in violation of the first and fourteenth amendments, 42 U.S.C. § 1983, and 43 Pa. Cons. Stat. Ann. § 1423(a) and (b) (the Pennsylvania "Whistle-blower" Law).

The case was tried before the Honorable William H. Yohn, Jr. and a jury, which returned a verdict in favor of Feldman and against defendants PHA, Saidel, and Paone.  The jury

awarded Feldman $616,696 in compensatory damages, of which $500,000 was for front pay. It also awarded Feldman punitive damages against Paone and Saidel in their individual capacities, in the amount of $10,000 each. Defendants now appeal. We have jurisdiction under 28 U.S.C. § 1291.

Defendant PHA raises three issues on appeal: 1) whether the district court erred in not granting judgment as a matter of law dismissing the first amendment and "whistleblower" claims; 2) whether the district court erred by allowing an award of front pay instead of reinstating plaintiff at PHA; and 3) whether the jury's $500,000 award for front pay was excessive.

Both Paone and Saidel argue that the evidence was insufficient to justify punitive damages. Saidel also challenges the award of punitive damages against him, claiming a lack of evidence to establish that he personally participated in Feldman's firing.

We affirm.

<u>DISCUSSION</u>

Review of a denial of a directed verdict is plenary, and we invoke the same standard that the district court applies. Thus, viewing the evidence in the light most favorable to Feldman, the nonmoving party, we determine whether there is evidence reasonably tending to support his claim. See <u>Bielevicz v. Dubinon</u>, 915 F.2d 845, 849 (3d Cir. 1990). While the role of an appellate court, in a first amendment case, requires an enhanced examination of the entire record, see <u>Bose Corp. v.</u>

Consumers Union of U.S., Inc., 466 U.S. 485, 499 (1984), "[a] jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict". Swineford v. Snyder County, 15 F.3d 1258, 1265 (3d Cir. 1994).

A. First Amendment Claim

Feldman recovered, in part, on a theory that his firing was in retaliation for his having engaged in speech protected under the first amendment. Determining whether PHA's dismissal of Feldman violated the first amendment requires a three-step analysis. See Swineford, 15 F.3d at 1270; Czurlanis v. Albanese, 721 F.2d 98, 103 (3d Cir. 1983). Feldman was first required to show that his speech constituted protected activity. See Pickering v. Board of Educ., 391 U.S. 563, 568 (1968). If protected, Feldman then had to establish that the speech was a substantial or motivating factor for his discharge. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). If Feldman satisfied the first two steps, then defendants could avoid liability by showing that they would have fired Feldman anyway. Id.

1. <u>Constitutionally Protected Activity</u>

A state cannot lawfully discharge an employee for reasons that infringe upon that employee's constitutionally protected interest in freedom of speech. <u>Rankin v. McPherson</u>, 483 U.S. 378, 383 (1987). A public employee's freedom of speech, however, does have its limits. The court must weigh the employee's interest in free speech against the government's interest in promoting efficiency among its employees. <u>See</u> <u>Versarge v. Township of Clinton New Jersey</u>, 984 F.2d 1359, 1364 (3d Cir. 1993). As the Supreme Court explained in <u>Pickering</u>:

> The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

391 U.S. at 568. It is for the court, not the jury, to perform the Pickering balancing test. <u>See</u> <u>Czurlanis</u>, 721 F.2d at 105 ("As the Supreme Court made clear in <u>Connick</u>, it is the role of the court in a case alleging retaliatory action which violates the First Amendment to decide not only whether the speech at issue related to a matter of public concern, but also to conduct the necessary <u>Pickering</u> balancing.").

Thus, in order to determine whether Feldman's speech was protected, we must first determine if the speech related to matters of public concern, or constituted merely personal grievances, <u>see Connick v. Myers</u>, 461 U.S. 138, 147 (1983); <u>Pickering</u>, 391 U.S. at 568, and looking at the entire record, we

must consider the content, form, and context of the speech for which Feldman contends he was fired.  See Connick, 461 U.S. at 147-48.

An employee's speech addresses a matter of public concern when it can "be fairly considered as relating to any matter of political, social or other concerns of the community". Id. at 146.  Feldman's speech was not related in any way to personal grievances; on the contrary, it clearly pertained to matters of important public concern.  The very purpose of his auditing reports was to ferret out and highlight any improprieties that he found at PHA.  Disclosing corruption, fraud, and illegality in a government agency is a matter of significant public concern.  See Swineford, 15 F.3d at 1274.

Next we must balance Feldman's interests in engaging in the speech, together with the public's interest in listening, against defendants' interest in promoting efficiency at PHA.  Id. The interests of Feldman, as well as the public, in exposing governmental wrongdoing of the nature and magnitude that Feldman's reports exposed, is very strong.  We have recently recognized:

> Speech involving government impropriety occupies the highest rung of First Amendment protection.  Moreover, the public's substantial interest in unearthing governmental improprieties requires courts to foster legitimate whistleblowing.

Swineford, 15 F.3d at 1274.

Defendants, however, stress in opposition the disruptive impact of Feldman's speech which, they argue, was

sufficient to deprive it of constitutional protection.  This argument is misplaced.  We have previously explained:

> The First Amendment balancing test [of Pickering] can hardly be <u>controlled</u> by finding that disruption did occur.  An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the office.  But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office * * *.  The point is simply that the balancing test articulated in <u>Pickering</u> is truly a balancing test, with office disruption or breached confidences being only weights on the scales.

<u>Czurlanis</u>, 721 F.2d at 107 (quoting <u>Porter v. Califano</u>, 592 F.2d 770, 773-74 (5th Cir. 1979)) (emphasis in original).  Moreover, revelations of misconduct at PHA by Feldman stand in a unique position. Feldman was not the typical employee exposing fraud within one's work environment; he was the head of a department whose very job it was to uncover improprieties.  Feldman's conduct was not only permitted, but required by the Internal Audit Department's charter, which provided:

> It is the policy of the Philadelphia Housing Authority (PHA) to determine the adequacy and effectiveness of management policies, controls and procedures with respect to all activities within PHA, and to insure full compliance with such policies, controls and procedures.
>
> In order to implement this objective, it is the policy of PHA to provide and support an <u>Internal Audit Department to determine the adequacy and effectiveness of management policies, controls and procedures in discharging management's responsibilities for the control of assets and operations</u> * * *.

(emphasis added).

As director of the Internal Audit Department, Feldman was responsible for uncovering and reporting any wrongdoing that he discovered at PHA. If done correctly, Feldman's very job was to be disruptive. His responsibility to investigate and ferret out improprieties extended not only to Feldman's co-workers, but also to Paone, the executive director, and yes, even Saidel, the chairman of the board. The charter specifically provided that the Internal Audit Department must "determine the adequacy and effectiveness of management policies, controls and procedures in discharging management's responsibilities for the control of assets and operations". (emphasis added).

Exposing waste, fraud, and corruption within an agency will likely cause disruption, particularly when done by a person whose responsibility it is to unveil such conduct. This type of disruption, however, cannot justify a retaliatory discharge.

At the time of his firing, Feldman was about to publish an audit report that would have revealed wrongdoing on the part of Paone and Saidel. Feldman, however, was fired the day the report was to be published. The jury could have reasonably concluded that this was no coincidence, especially in light of the fact that after being fired, Feldman was escorted from his office by two police officers, and prevented from either circulating the report or even retrieving any of his work.

Very likely, publication of the report would have caused some disruption at PHA, particularly between Feldman and

his superiors, Paone and Saidel.  Defendants would have us believe, however, that the disruption would have been great enough to justify, under Pickering balancing, their firing of Feldman.  We disagree.  Feldman did what the charter required him to do; failure to do so would have been a breach of his responsibilities.  Moreover, the subject matter of his reports -- improprieties in governmental business -- occupies a high level of public concern.  Simply because his reports might cause disruption in the eyes of Paone and Saidel, the very people he was reporting on, could not be a sufficient justification for his discharge.  We conclude that Feldman's speech was constitutionally protected.

### 2. Unconstitutional Discharge

Feldman contended that his discharge was caused by defendants' retaliatory motives.  The record is replete with evidence from which the jury could properly conclude that Feldman's firing was directly precipitated by his engaging in protected speech.  Initially, defendants told Feldman that the reason he was being fired was that they were reorganizing the audit department.  This, the jury could have found, was a pretext.  Except for a few minor changes, the audit department was substantially the same at the time of trial as it was when Feldman was fired.

Defendants later abandoned their initial reason for the firing, and launched an intense attack on Feldman's ability to perform his job.  They alleged, inter alia, that Feldman was

insubordinate, self-serving, and overall, an incompetent employee. Their attack on Feldman's alleged incompetence as the reason for his dismissal raised a jury issue. Incidentally, the argument is substantially undercut by PHA's present contention that Feldman should be reinstated at PHA instead of receiving front pay. Because there is ample evidence to support the jury's finding that Feldman was fired for engaging in protected activity, we affirm the jury's determination that defendants violated Feldman's constitutional rights.

Defendants also argue that the district court committed reversible error by failing to conduct, on the record, particularized fact-finding and balancing under Pickering. They further contend that the district court inappropriately submitted to the jury all of Feldman's statements and reports before first determining for itself which, if any, were protected. Defendants, however, have failed to preserve these issues for appeal. They did not except to the court's jury instruction concerning Pickering, nor did they take any pre-verdict exception to the district court's failure to make specific factual findings on the record.

Even if defendants had properly preserved the record, we would still affirm. Although the district court did not perform the Pickering balancing test in precisely the fashion that some cases suggest is appropriate, it is apparent from the district court's memorandum and order denying defendants' motion for judgment notwithstanding the verdict, that it had considered all of Feldman's speech to be constitutionally protected under

Pickering.  Consequently, we see no prejudicial error in the court's having first submitted the same issue to the jury, which arrived at the same conclusion.

B. Front Pay Versus Reinstatement

PHA argues that the district court erred by permitting an award of front pay instead of ordering Feldman reinstated at PHA.  The equitable remedy of reinstatement is available for discharges that violate 42 U.S.C. § 1983, see Versarge, 984 F.2d at 1368, and reinstatement is the preferred remedy to cover the loss of future earnings.   See Blum v. Witco Chem. Corp., 829 F.2d 367, 373-74 (3d Cir. 1987).   However, reinstatement is not the exclusive remedy, because it is not always feasible, such as when there exists "irreparable animosity between the parties". Id. at 374.; see also Versarge, 984 F.2d at 1368.  When reinstatement is not appropriate, front pay is the alternate remedy.  See Maxfield v. Sinclair International, 766 F.2d 788, 796 (3d Cir. 1985), cert. denied, 474 U.S. 1057 (1986).  Guided by the particular circumstances of a case, the district court has broad discretion in determining whether reinstatement is appropriate, and its determination is reviewed under an abuse-of-discretion standard.  See id.

Although Feldman initially requested reinstatement in his complaint, he sought, prior to trial, to have reinstatement excluded as a potential remedy.  The district court deferred its ruling until after both sides had presented their evidence to the jury.  Then, having heard all the evidence, the district court

held that reinstatement was not feasible, because "irreparable distrust and animosity developed between Feldman and PHA as a result of the events prior to his termination, the termination itself, and the litigation that followed in its wake".  The district court also concluded that the "lawsuit irrevocably impaired [Feldman's] ability to function as an auditor at PHA".  Consequently, the district court submitted to the jury the issue of the amount of front pay that Feldman should be awarded.

PHA also argues that because Paone and Saidel are no longer with PHA, the animosity is no longer present.  Even on this appeal, PHA has joined Paone and Saidel in their continuing, albeit unsuccessful attack on Feldman's professional competence and personal integrity.  The record contains ample evidence of the hostility that was caused by this litigation.  The facts surrounding Feldman's firing, together with defendants' litigation strategy, are but two examples of the irreparable animosity that resulted.  We conclude that the district court did not abuse its discretion in allowing front pay rather than reinstatement.

During this litigation, PHA offered Feldman another position at the agency.  However, having determined that the district court did not abuse its discretion in permitting the alternate remedy of front pay, we need not address the effect of Feldman's rejection of the offer.

Contrary to PHA's contention, neither Feldman nor the court was bound by Feldman's alternative request for reinstatement made in the wherefore clause of his complaint.

Relief is determined by the merits of the case, not by the pleadings. Rule 54(c) of the Federal Rules of Civil Procedure provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Fed. R. Civ. P. 54(c).

In short, we see no reason at this late date to overturn the district court's determination, fully supported by the record when made, that front pay was appropriate relief in the circumstances of this case.

C. <u>Amount of Front Pay</u>

PHA asserts that even if some front pay was appropriate, the jury's award of $500,000 was excessive, considering Feldman's age, experience, and future likelihood of employment. While PHA's argument is cast in terms of excessiveness, it, at times, seems to be faulting the district court for failing to instruct the jury on mitigation of damages, i.e., on what the jury should do if it believed Feldman would be capable of securing other employment at some point prior to retirement age. The district court did instruct the jury on this point, however. Its charge was not materially different from that requested by the defense and was not objected to by it. The court's instruction was:

> "Now, award of front pay or future damages is used to make the plaintiff whole for future expected losses. In calculating such an award, you must consider the expected future damages caused by defendants' wrongful

conduct from the date of judgment to the date of retirement by the plaintiff, less any wages and benefits he might receive during that same period of time. In other words, future damages in this case consists of what Mr. Feldman would have earned in wages and benefits working at PHA, less whatever he earns from any other employment he undertakes from the date judgment is entered to the date of his expected retirement.

If PHA proves that Mr. Feldman unjustifiably failed or fails to take a new job of like kind, status and pay which is available to him or he fails to make reasonable efforts to find a new job, you must also subtract any amount he could have earned in that new job after today."

Based on these instructions, the jury awarded to Feldman front pay of $500,000. The jury's verdict may not be disturbed unless the record is critically devoid of the minimal amount of evidence upon which the jury could have reached its verdict. See Swineford, 15 F.3d at 1265; Dutton v. Wolpoff and Abramson, 5 F.3d 649, 653 (3rd Cir. 1993). On this record, we think that the evidence supports the jury award.

Feldman's actuarial–economic expert testified extensively on plaintiff's lost future income, making several sophisticated calculations that produced various figures, depending upon which criteria he applied. The $500,000 award, however, was over $30,000 less than the lowest figure calculated by Feldman's expert. Defendants called no expert of their own, and they offered no evidence to controvert the testimony of Feldman's expert.

The jury's award, therefore, was sufficiently supported by the evidence, and we do not think that $500,000 is so excessive as to shock the conscience of this court.  See Savarese v. Agriss, 883 F.2d 1194, 1205 (3d Cir. 1989).

D. Punitive Damages

The jury awarded punitive damages against Paone and Saidel, in their individual capacities, in the amount of $10,000 each.  Both of them contend that their conduct here does not sink to the level that would permit punitive damages.  In addition, Saidel argues that he should not have been found liable for punitive damages because he did not have sufficient involvement with Feldman's firing.  We disagree with both contentions.

Punitive damages are authorized on Feldman's federal and state law claims.

> In a § 1983 action:
> [A] jury may be permitted to assess punitive
> damages * * * when the defendant's conduct is
> shown to be motivated by evil motive or
> intent, or when it involves reckless or
> callous indifference to the federally
> protected rights of others.

Smith v Wade, 461 U.S. 30, 56 (1983).  Similarly, the Pennsylvania Supreme Court has stated that "punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others."  Feld v. Merriam, 506 Pa. 383, 485 A.2d 742, 747 (Pa. 1984) (internal quotations omitted).

It is true that Paone's conduct was more culpable than Saidel's. The record contains evidence, however, from which the jury could reasonably have concluded that Saidel not only knew about and acquiesced in, but also directed Paone's firing of Feldman for engaging in his constitutionally protected speech. Saidel and Paone worked closely together on PHA matters, and Feldman's reports implicated both Saidel and Paone in the mismanagement of PHA. Paone testified that before firing Feldman, he spoke with Saidel about the matter and that Saidel "concurred" with the decision to terminate Feldman. Paone further testified that he and Saidel discussed the reorganization of the Internal Audit Department, one of the pretextual reasons initially offered for their discharge of Feldman. However, the Internal Audit Department, with only a few minor changes, remained the same. In response to written interrogatories, defendants admitted that the only step taken to reorganize the department was that the director of the Internal Audit Department "no longer reports to the Board of Commissioners but reports to the Executive Director".

The jury could reasonably have inferred that Paone would not have engaged in the unlawful firing of Feldman without first consulting with and obtaining Saidel's approval, that Saidel thus participated in the retaliatory firing of Feldman; that they fired him in order to conceal their own mismanagement at PHA; and that this conduct sank to the levels of conduct that justify imposition of punitive damages under both federal and

Pennsylvania law.  We conclude that both Paone and Saidel must pay the modest punitive damages the jury assessed against them.

We have considered defendants' remaining arguments and find them to be similarly without merit.

## CONCLUSION

The judgment of the district court is affirmed.

_____


### Feldman v. Philadelphia Housing Auth.
#### Nos. 93-1977, 93-1978, 93-2115, 93-2129, 93-2139


GARTH, Circuit Judge, concurring in part and dissenting in part:

While I agree with the majority's conclusion that Feldman's actions as Director of Internal Audit at the Philadelphia Housing Authority were entitled to First Amendment protection under Pickering, I find that the majority's failure to identify any evidence supporting (1) the failure to reinstate Feldman, (2) the excessive front pay award of $500,000, and (3) the punitive damage award imposed upon Saidel requires reversal.

Thus, I would reverse and remand to the district court with instructions that it order reinstatement of Feldman, that it vacate the front pay award of $500,000 and that it vacate the punitive damage award against Saidel.

I

So that my disagreement with the majority may be clearly understood, I fault the majority's opinion because it does not point to any evidence in the record nor does it discuss the relevant case law, which can support an affirmance of the three issues I have identified. In my view, it is not sufficient to state in a conclusory manner that there is "ample evidence" to support the court's finding (Maj. Op, p. 17) without calling attention to at least some evidence. Nor is it sufficient to decide complex issues such as front pay or restitution with little reference to the criteria established in case law and without relating the facts of record to those criteria. Indeed, one can search long and hard in the record for the evidence which "fully support[s]" the district court's determination that front pay to retirement was appropriate relief in this case. (Maj. Op. p. 18.) But that search reveals nothing. One can look even harder to find evidence that would support a $500,000 front pay award to retirement for a 38-year-old professional auditor who rejected an annual salary of $66,616 in favor of working for $12,500 annually and who has an opportunity to reestablish himself in the job market long prior to his retirement.

Finally, there is just no evidence to be found in the record of outrageous, wanton or reckless conduct on the part of Saidel. This is the standard by which punitive damages are measured. While there is evidence in the record that supports

compensatory damages -- specifically Saidel's concurrence in the decision to discharge Feldman, this meager fact alone does not warrant a punitive damage award against Saidel. The majority's decision suggests that a supervisor's concurrence in any unlawful discharge must result in both compensatory and punitive damages, a doctrine which Pennsylvania has yet to adopt.

In short, my quarrel with the majority is that it has taken unwarranted liberties with the record and has glossed over the lack of evidence in reaching its conclusions. Having set forth the predicate for this separate opinion, I now recite in some detail the reasons why I disagree so strongly with the majority on the three issues I have identified: reinstatement, excessive front pay and punitive damages.

II

In his original complaint, and in his amended complaint, Feldman asked to be reinstated to his former position at the housing authority. A few months before trial, PHA offered to reinstate Feldman to a different position, but at the same salary.

Thereafter, Feldman filed a motion asking the district court to rule that PHA had failed to offer him a "substantially equivalent" position and that reinstatement was not a viable remedy as a result of continuing animosity between him and PHA.

Immediately before closing arguments, the district court granted Feldman's motion. Ultimately, the jury awarded Feldman $500,000 in front pay in lieu of reinstatement. In a post-trial motion, PHA, in addition to arguing that the front pay award was improper and excessive, also argued that the district court had erred in ruling that reinstatement was inappropriate. The district court rejected PHA's arguments.

In particular, the district court reiterated its view that reinstatement was not a feasible remedy because "[i]rreparable distrust and animosity [had] developed between Feldman and PHA as a result of the events prior to his termination, the termination itself, and the litigation that followed in its wake." Dist. Ct. Order of 9/16/93 at 3. The district court noted that: (1) Feldman had been fired for insubordination; (2) Feldman's ability to function as an auditor at PHA had been irrevocably impaired by his lawsuit; and (3) although Paone and Saidel no longer worked at PHA, "many of the people, with whom or for whom Feldman would work if he were to return, worked at PHA prior to his termination." Dist. Ct. Order of 9/16/93 at 5.

In my opinion, the district court abused its discretion when it refused to reinstate Feldman.

III

In employment discrimination suits, there are two alternative remedies available to compensate a claimant for future lost earnings: reinstatement or front pay. The determination of which remedy is appropriate is left to the discretion of the district court judge. Blum v. Witco Chem. Corp., 829 F.2d 367, 374 n.4 (3d Cir. 1987); Maxfield v. Sinclair Int'l, 766 F.2d 788, 796 (3d Cir. 1985), cert. denied, 474 U.S. 1057 (1986). Only after the judge determines that reinstatement is not feasible, and that front pay is appropriate, does the jury calculate a front pay award. Accordingly, when we review a district court's order to reinstate, or to deny reinstatement, we are not reviewing a jury determination. Rather, we are reviewing a judge's ruling. In reviewing the district court's exercise of discretion, we consider not only the reasons proffered by the district court for its determination, but also whether those reasons find support in the record.

It is well settled that reinstatement is the preferred remedy to avoid future lost earnings. Maxfield, 766 F.2d at 796; see also James v. Sears, Roebuck & Co., 21 F.3d 989, 997 (10th Cir. 1994); Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 678 (7th Cir. 1993); Roush v. KFC Nat'l Management Co., 10 F.3d 392, 398 (6th Cir. 1993), cert. denied, 115 S. Ct. 56 (1994); Brunnemann v. Terra Int'l, Inc., 975 F.2d 175, 180 (5th Cir. 1992); Wilson v. S & L Acquisition Co., L.P., 940 F.2d 1429, 1438 (11th Cir. 1991); Duke v. Uniroyal, Inc., 928 F.2d 1413,

1424 (4th Cir. 1991), cert. denied, 112 S. Ct. 429 (1991); Cassino v. Reichhold Chems., Inc., 817 F.2d 1338, 1346 (9th Cir. 1987), cert. denied, 484 U.S. 1047 (1988).  Only when the evidence supports a judge's decision that reinstatement is not feasible, may he award front pay in lieu of reinstatement.  Reinstatement may not be deemed feasible (1) where the relationship between the parties has been so damaged by animosity as to make reinstatement impracticable, Robinson v. Southeast Pa. Transp. Auth., 982 F.2d 892, 899 (3d Cir. 1993); Witco Chem. Corp., 829 F.2d at 373-74; Maxfield, 766 F.2d at 796; or (2) where no comparable position is available to which the claimant can be reinstated.  Witco Chem. Corp., 829 F.2d at 374; Whittlesey v. Union Carbide Corp., 742 F.2d 724, 728 (2d Cir. 1984).

A.

I believe that the record simply does not support the district court's finding that substantial animosity had developed between Feldman and PHA -- as opposed to the animosity that had evolved between Feldman, on the one hand, and Paone and Saidel on the other. Nor has the majority identified any such evidence. Speculation that Saidel might, in the future, be re-elected to the position of city comptroller and, in that capacity, be permitted to appoint persons to the Board of Commissioners, which in turn governs PHA, simply is too remote to support an award of front pay in lieu of reinstatement and is no substitute for evidence. Accordingly, in my opinion, the district court's finding of fact that Feldman could not enjoy a productive working relationship with PHA were he to be reinstated, is clearly erroneous.

Unlike almost all cases in which reinstatement is denied, here there is no record evidence of lingering hostility between Feldman and any individual still working at PHA.[1] While

---

[1] See, e.g., Robinson, 982 F.2d at 899 (3d Cir. 1993) (affirming district court's denial of reinstatement where evidence supported finding of lingering hostilities between plaintiff and his supervisors); Versarge v. Township of Clinton, 984 F.2d 1359 (3d Cir. 1993) (holding reinstatement inappropriate "because of the great animosity between plaintiff and other volunteer firefighters"); Standley v. Chilhowee R-IV Sch. Dist., 5 F.3d 319, 322 (8th Cir. 1993) (upholding district court's denial of plaintiffs' request for reinstatement to former teaching positions on grounds that (1) school district and school building were very small; (2) record was filled with testimony regarding tense and hostile atmosphere at school between plaintiffs, individual defendants, and other teachers; and (3)

some PHA employees testified at trial, their testimony did not reveal any animus towards Feldman.  See Bingman v. Natkins & Co., 937 F.2d 553, 558 (10th Cir. 1991) (affirming district court's finding that work place would not be unduly hostile where "all persons involved in plaintiff's termination testified, and none showed animosity toward him because of [his] lawsuit").

Most importantly, Paone and Saidel no longer work for the Philadelphia Housing Authority.  See, e.g., Rodgers, 12 F.3d at 678 (affirming district court's award of reinstatement where supervisor, whose racial comments had been the impetus for Rodgers' Title VII action, no longer worked for Western-Southern); Marshall v. TRW, Inc., 900 F.2d 1517, 1523 (10th Cir. 1990) (reversing award of front pay where two employees who made the decision to discharge Marshall were no longer employed by TRW); Morgan v. The Arkansas Gazetteer, 897 F.2d 945, 953 (8th Cir. 1990) (affirming reinstatement order where any animosity was eradicated inasmuch as employees responsible for the

friction that precipitated lawsuit would dog the school districts if plaintiffs were returned to their positions); Tennes v. Commonwealth of Mass. Dep't of Revenue, 944 F.2d 372, 381 (7th Cir. 1991) (affirming denial of reinstatement where there was no reason to believe that parties would enjoy a productive and amicable working relationship); Spulak v. K Mart Corp., 894 F.2d 1150, 1157 (10th Cir.) (affirming award of front pay in lieu of reinstatement where record supported Spulak's assertion that K Mart's investigation of Spulak's alleged illegal activities "left his employees with the impression that he was guilty of wrongdoing, rendering him unable to function amicably and productively in his former supervisory capacity," and where the level of animosity between Spulak and K Mart only increased as a result of the litigation).

discrimination no longer worked for the Arkansas Gazetteer); Jackson v. City of Albuquerque, 890 F.2d 225, 232 (10th Cir. 1989) (reversing district court's denial of reinstatement where "most of those making complaints against [Jackson] are no longer employed" by the City's park department).

Although this might be a very different case were Paone and Saidel still employed by PHA, quite clearly, they are not. See, e.g., Grantham v. Trickey, 21 F.3d 289, 296 (8th Cir. 1994) (concluding that unacceptable level of hostility existed and, thus, reinstatement not feasible, inasmuch as claimant would have to report to supervisor with whom he had "the most bitter conflict"); Prive v. Marshall, Erdman & Assocs., Inc., 966 F.2d 320, 325 (7th Cir. 1992) (disapproving "reinstatement of a high-level employee performing discretionary functions into the division from which he was fired and which remains under the management of the person who fired him"). That distinction dictates a vastly different result from that reached by the district court and now affirmed by the majority of this court.

In addition, between the time Feldman filed his first complaint and the time he filed his amended complaint, HUD took over PHA and appointed a special master to assume control of the housing authority's daily operations. PHA, under new management, has given every indication that it would like to see Feldman return. Although the litigation of Feldman's claim may have generated animosity, that animosity, as I have pointed out, was

generated by or against Paone and Saidel, and not by or against PHA. Moreover, despite the majority's reliance upon this factor, the existence of litigation-based hostility, without more, generally is not sufficient to defeat reinstatement.[2] (Maj. Op. p. 17). Whether or not it might be uncomfortable for Feldman to return to work at PHA, our jurisprudence implicitly tolerates such discomfort as an unavoidable concomitant of our well-established preference for reinstatement over front pay.

Concededly, the general rule is that a district court may exercise its discretion to award front pay in lieu of reinstatement. Its determination, however, must be well reasoned and supported by record evidence. Here, there is not even a

---

[2] See Grantham, 21 F.3d at 296 (holding hostility necessary to support award of front pay "must go beyond the normal hostility between parties to litigation"); United States E.E.O.C. v. Century Broadcasting Corp., 957 F.2d 1446, 1462 (7th Cir. 1992) (rejecting claim of hostility where only hostility present was that "hostility common to litigation"); Walther v. Lone Star Gas Co., 952 F.2d 119, 127 (5th Cir. 1992) (vacating award of front pay where district court stated only that the litigation was "protracted and necessarily vexing" and did not support its finding with specific instances of discord); Goldstein v. Manhattan Indus., Inc., 758 F.2d 1435, 1448 (11th Cir. 1985) (affirming reinstatement of plaintiff who had argued that litigation caused ill feelings between himself and persons who would be his immediate superiors, but where supervisor testified that he would be happy to have plaintiff back under same terms as when he left); Dickerson v. Deluxe Check Printers, Inc., 703 F.2d 276, 281 (8th Cir. 1983) (holding "friction arising from the litigation process itself is not alone sufficient to deny employment"). Cf. Berndt v. Kaiser Alum. & Chem. Sales, Inc., 789 F.2d 253, 261 (3d Cir. 1986) (upholding district court's award of front pay in lieu of reinstatement where "relationship between plaintiff and Kaiser has been so damaged by the litigation that a continued working relationship for the four months remaining until plaintiff will retire is not feasible").

scintilla of evidence that Feldman's working relationship with PHA, as distinguished from his relationship with the now absent Paone and Saidel, would be tainted by any animosity. Unfortunately, the majority, as I have earlier indicated, has not called our attention to any evidence supporting the district court or its conclusion. This is not surprising as there is no such evidence disclosed in the record.

Thus, inasmuch as the district court's determination that reinstatement was not feasible was grounded on its unsupported and, therefore, erroneous finding that there was unabated hostility between Feldman and PHA, the district court's determination was an abuse of discretion.

B.

It should not be overlooked, as I have emphasized, that the question of whether reinstatement, in fact, is viable, is a question for the judge and not the jury. Thus, it is the judge who must determine whether the claimant's former position still exists or whether it has been eliminated, whether a comparable position is available, whether reinstatement should proceed, and how. In the present case, not only did PHA make an offer of reinstatement, but it conceded that, regardless of PHA's offer, had the district court ordered reinstatement, PHA would have been obligated to reestablish Feldman's position, and reinstate him to it.

Although the district court found that the position offered by PHA to Feldman before trial was not substantially equivalent to the one Feldman held before he was fired, the district court did not make any explicit findings as to whether some other substantially equivalent position existed at PHA to which Feldman could be reinstated.[3]  See, e.g., Anderson v. Phillips Petroleum Co., 861 F.2d 631, 638 (10th Cir. 1988) (reversing award of front pay and ordering reinstatement where company could have reinstated Anderson to a comparable position); cf. Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796 (8th Cir. 1994) (upholding district court front pay award where district court found that Nelson's position no longer existed and that there was no comparable position to which he could be reinstated).  Nor did the district court make a determination with respect to whether a position could have been created to which Feldman could be reinstated.

PHA asserted at oral argument that Feldman could have been reinstated to the exact same position he held before he was fired.  I grant that this somewhat belated assertion must be accepted with a measure of skepticism inasmuch as it differs from the position advanced by PHA before the district court.  There PHA argued that IAD had been completely reorganized and that its

_____

[3] Front pay also may be awarded in lieu of reinstatement where no comparable position is available to which the claimant can be reinstated.  Witco Chem. Corp., 829 F.2d at 374; Whittlesey, 742 F.2d at 728 (2d Cir. 1984).

pre-trial offer to Feldman of "Chief, Procurement Audit Unit" was the best it could do.  In this connection, Feldman had claimed before the district court that his former position, "Director of Internal Audit," had been renamed "Manager of Internal Audit" and that, at the time of trial, the position was filled by a former subordinate, Edward Merenda.

I am satisfied that reinstatement still would be feasible, and an available remedy, even though a third person might now occupy Feldman's former position.  For example, in Reeves v. Claiborne County Bd. of Ed., 828 F.2d 1096, 1101-1102 (5th Cir. 1987), the district court refused to reinstate Reeves to her former position because a replacement had been hired during the course of the litigation.  The Fifth Circuit reversed:

> If the existence of a replacement constituted a complete defense against reinstatement, then reinstatement could be effectively blocked in every case merely by hiring an innocent third party after the retaliatory purpose was achieved. . . . While reinstatement may displace an innocent employee, the "[e]nforcement of constitutional rights [may have] disturbing consequences.  Relief is not restricted to that which would be pleasing and free of irritation."

Id. at 1102 (citations omitted); see also Brunnemann, 975 F.2d at 180 (affirming reinstatement order even though Brunnemann's former position already was held by another employee where there was no evidence of animosity or hostility between the parties).  Contra United States E.E.O.C. v. Century Broadcasting Corp., 957 F.2d 1446, 1463 (7th Cir. 1992) (holding reinstatement not

feasible where claimant's position had been filled by third party).

I see no reason why reinstatement here could not be ordered as it is with respect to workers who are discharged as the result of, or who go out on strike to protest, an employer's unfair labor practice. "Under those circumstances, the striking employees do not lose their status [as employees] and are entitled to reinstatement with back pay, even if replacements for them have been made." Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 278 (1956). That is, "an employer must dismiss replacement workers if necessary to make room for the returning unfair labor practice strikers." NLRB v. International Van Lines, 409 U.S. 48, 50-51 (1972); see, e.g., Aguayo for NLRB v. Tomco Carburetor Co., 853 F.2d 744, 750 (9th Cir. 1988) (rejecting Tomco's argument that reinstatement would be inappropriate because eleven innocent workers would have to be discharged and holding that "the rights of the employees who were discriminatorily discharged are superior to the rights of those whom the employer hired to take their places"). Inasmuch as Feldman was fired, essentially, as the result of an unfair labor practice, I see no reason why his right to reinstatement -- the relief he requested originally and our preferred remedy -- should be subordinated to the rights of whichever employee was hired to replace him.

In light of the unequivocal representation made by PHA to us that, if reinstated, Feldman would have his former position

reactivated, I would remand to the district court to accept PHA's offer and to order that Feldman be reinstated as Director of Internal Audit or its equivalent with appropriate back pay.

IV

Even if front pay were appropriate in the present case, the $500,000 actually awarded to Feldman by the jury was clearly excessive.  See Williams v. Martin Marietta Alumina, Inc., 817 F.2d 1030, 1038 (3d Cir. 1987).

A.

PHA argues that Feldman should not have been granted front pay until the age of retirement but, rather, until a point in time at which he "would be expected to regain a position at the level of the one he lost when his employment was terminated." Appellant's Br. at 43.

The time period over which the jury calculated its front pay award goes to the heart of the question of whether that award was excessive.  We have held that "[i]n selecting a cut-off date for an equitable front pay remedy the [district] court exercises discretion."  Goss v. Exxon Office Sys. Co., 747 F.2d 885, 890 (3d Cir. 1984).  Accordingly, in determining whether the front pay amount awarded by the jury was excessive, it is proper for us to consider whether the district court's front pay instruction to the jury caused the jury to return with a front pay award that was excessive.[4]  That instruction required that

---

[4] PHA's requested jury instruction, which was not granted by the district court, did not limit the end date to "retirement." Rather, it would have instructed the jury, among other things, that "[i]f you decide to award [front pay], front pay begins today.  It ends when James Feldman would have stopped working for

the jury calculate its front pay award "from the date of judgment to the date of retirement by the plaintiff."

I conclude that the district court abused its discretion in selecting a cut-off date ("retirement") which was unreasonable in the context of this case.  As a result, the jury granted to Feldman an excessive front pay award.


B.

The purpose of front pay is to make an injured employee whole by compensating him for future lost earnings resulting from his wrongful termination.  The future, of course, is unknown, and we have been reluctant to award front pay where such an award would be overly speculative.  Goss, 747 F.2d at 889.  Common sense dictates that the farther into the future a front pay award reaches, the more speculative it becomes.  Consequently, "[a] claimant's work and life expectancy are pertinent factors in

---

PHA (because of retirement or termination or otherwise) in the absence of dismissal."

Despite the majority's contention to the contrary (Maj. Op. p. 18-19), the district court did not leave it to the jury to determine the termination date for front pay.  Rather, the district court instructed the jury to award front pay from the date of judgment to the date of retirement.  See id. at 19. Thus, the instruction given by the district court to the jury was fundamentally different from the instruction requested by PHA. The PHA instruction, as noted in text, left to the jury the appropriate cutoff date for front pay.

calculating front pay."  Anastasio v. Schering Corp., 838 F.2d 701, 709 (3d Cir. 1988).

When a plaintiff's work expectancy is relatively short, it is not overly speculative and, therefore, appropriate to award front pay "to retirement."  Duke v. Uniroyal, Inc., 928 F.2d 1413, 1424 (4th Cir. 1991) ("If a plaintiff is close to retirement, front pay may be the only practical approach.").  Thus, in ADEA cases, front pay often is awarded from the date of discharge to the date of retirement based on the assumption that, in many instances, ADEA claimants will not work long enough to reestablish themselves in the marketplace.  See, e.g., Witco Chem. Corp., 829 F.2d at 374-76 (awarding "front pay-to-retirement" where plaintiffs were all within eight years of normal retirement age when terminated and, therefore, it was not overly speculative to assume that the plaintiffs would have finished their working careers working for Witco).

This is not to say, however, that all front pay awards should be calculated to the plaintiff's date of retirement.  In fact, not even all ADEA claimant's are entitled to "front pay-to-retirement."  See Anastasio, 838 F.2d at 709 ("The purpose of front pay under the ADEA is to ensure that a person who has been discriminated against on the basis of age is made whole, not to guarantee every claimant who cannot mitigate damages by finding comparable work an annuity to age 70."); Davis v. Combustion Eng'g, Inc., 742 F.2d 916, 923 (6th Cir. 1984) (noting that an

award of front pay to 41-year old until normal retirement age might be unwarranted while failure to make such an award to 63-year old might be an abuse of discretion).[5]

In those cases in which the plaintiff is not close to retirement age, the expectation that he will continue working tempers the need for "front pay-to-retirement," the award of which might constitute a "windfall" for the plaintiff. Standley v. Chilhowee R-IV School District, 5 F.3d 319, 322 (8th Cir. 1993). In such cases, one can only speculate "how long the plaintiff actually would have remained working at the job, whether the plaintiff soon would have left for a different, perhaps better-paying, job, or whether the plaintiff soon would have been dismissed for legitimate reasons." Id. Consequently, the general rule in such cases is that front pay may only be awarded "for a reasonable future period required for the victim to reestablish her rightful place in the job market." Goss, 747 F.2d at 889; see also Cassino v. Reichhold Chems., Inc., 817 F.2d

---

[5] It is not surprising that relevant caselaw reveals that "front pay-to-retirement" only has been awarded where the plaintiff is close to retirement age. See, e.g., Boehm v. American Broadcasting Co., Inc., 929 F.2d 482, 488 (9th Cir. 1991) (awarding six years "front pay-to-retirement" where district court found that Boehm would not be able to obtain a position equivalent to his former job); Witco Chem. Corp., 829 F.2d at 373-74 (awarding "front pay-to-retirement" where plaintiffs were within eight years of retirement); Davis, 742 F.2d at 923 (approving jury's $88,000 front pay award, based on district court's finding that Davis was 59 years old and facing mandatory retirement in six years).

at 1347 (9th Cir. 1987) (stating that front pay is intended to be temporary in nature).

Just as it is a plaintiff's duty to mitigate his damages prior to trial, see Ford Motor Co. v. EEOC, 458 U.S. 219, 232 (1981), cert. denied, 454 U.S. 1030 (1981), it is expected that he will continue to mitigate his damages into the future. Maxfield, 766 F.2d at 796 (recognizing that plaintiff's duty to mitigate serves as a control on front pay damage awards); Whittlesey, 742 F.2d at 728 (noting that award of front pay "does not contemplate that a plaintiff will sit idly by and be compensated for doing nothing").

The Second Circuit explained this concept of "future mitigation" in Dominic v. Consolidated Edison Co., 822 F.2d 1249 (2d Cir. 1987), a case in which the Court of Appeals upheld a district court's decision to reduce an ADEA claimant's front pay award:

> Had Con Edison proved that Dominic failed to mitigate damages -- for example, by refusing a substantially equivalent job -- Dominic's back-pay award would have been cut off or reduced at the time of his failure to mitigate and any front-pay award would have been foreclosed.  See Ford Motor Co. v. EEOC, 458 U.S. 219, 233-34 (1982).  However, Con Edison's failure to show that Dominic had not mitigated damages does not entitle him to a lifetime front-pay award.  In calculating the size of a front-pay award the court must estimate the plaintiff's ability to mitigate damages in the future.

Id. at 1258 (affirming district court's award of two years front pay) (emphasis added).  It follows that a plaintiff may only receive front pay for that period of time reasonably necessary for him to mitigate his losses.  See Cassino, 817 F.2d at 1347 (reversing front pay award where jury, "without instruction on mitigation, found that Cassino was entitled to front pay from the time of trial until the time he would have retired"); Fitzgerald v. Sirloin Stockade, Inc., 624 F.2d 945, 956 (10th Cir. 1980) (awarding front pay for five years to reflect amount of time necessary for plaintiff to reach the current salary of the position from which he was fired).

Simply stated, the longer a plaintiff is expected to work, the more likely it becomes that he will have sufficient opportunity to mitigate his damages.  Given this likelihood of mitigation, the longer the period upon which a front pay award is based, the more likely that the award will be overly speculative.

C.

In the present case, Feldman was fired from an auditing position at which he was earning $66,616 per year.  Prior to trial, HUD, which had taken over PHA, offered to reinstate Feldman to an auditing position, at his old salary.  Feldman refused the offer.  Six months after his discharge, Feldman had accepted a non-salaried "sales-like" position with the Individual Financial Services Division of the CIGNA Corporation -- a

position unrelated to auditing -- which paid Feldman $12,500 a year.

I agree that PHA's actions caused Feldman significant harm. Feldman testified that his firing had an emotional effect on his family life. The jury awarded him $50,000 to compensate him for his mental and emotional distress.

Front pay, however, is not intended as damages for mental distress. Rather, front pay is designed to reimburse a claimant for his future lost earnings. I do not believe that, under the circumstances, it was reasonable for Feldman to refuse a job similar (though not identical) to the one from which he was fired -- a job that would have paid him $66,616 a year -- when he was earning only $12,500 in a field unrelated to the one for which he was trained. Rather, I am convinced that, had Feldman acted reasonably, he would not have suffered a future loss of the magnitude that is reflected in the jury's outrageous $500,000 front pay award.

Furthermore, I would conclude that the $500,000 front pay award was excessive, even if I were persuaded that Feldman, in fact, was justified in turning down HUD's reinstatement offer. At the time of trial, Feldman was thirty-eight years old. By all accounts, he is a highly trained professional. He has been in the work force for fewer than twenty years. He will be part of the work force, one can expect, for, at least, another twenty-seven years. In light of these uncontroverted facts, there can

be no justification for, just as there is no legitimate evidence supporting, the $500,000 front pay award, calculated to Feldman's retirement age of 65.

Under these circumstances, to have permitted the jury to consider a front pay award to retirement was an abuse of discretion on the part of the district court. While we have never said so explicitly, I believe that it was the district court's responsibility to determine, and then to instruct the jury as to, a finite period over which the jury should have calculated its front pay award. At worst, the district court should have instructed the jury to award front pay "for a reasonable future period required for [Feldman] to reestablish [his] rightful place in the job market." Goss, 747 F.2d at 889. Whichever is the correct approach, clearly the district court abused its discretion when it directed the jury to calculate Feldman's front pay award to retirement.

I conclude that the jury's highly speculative front pay award -- $500,000 -- given the circumstances, was so "grossly excessive as to shock the judicial conscience." Williams, 817 F.2d at 1038. I would direct that the front pay award be vacated.

                              VI

Saidel argues that the jury's verdict against him on both his compensatory and punitive liability must be reversed for

lack of sufficient evidence. While I agree with the majority that the record could be read to support the jury's finding with respect to Saidel's _compensatory_ liability, I do not believe that there was sufficient evidence to satisfy the stricter standard which must be met in order for a jury to award _punitive_ damages.

Punitive damages may be awarded in § 1983 actions "for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." _Smith v. Wade_, 461 U.S. 30, 46–47 (1983), _quoting_ Restatement (Second) of Torts § 908(2). _See_ _also_ _Savarese v. Agriss_, 883 F.2d 1194, 1204 (3d Cir. 1989). Pennsylvania has adopted the same standard for awarding punitive damages. _See_ _Chuy v._ _Philadelphia Eagles Football Club_, 595 F.2d 1265, 1277 (3d Cir. 1979) (_in banc_); _Rizzo v. Haines_, 555 A.2d 58, 69 (Pa. 1989).

I find nothing in the record which suggests that Saidel's single action of "concurring" in Paone's decision to terminate Feldman's employment was so "outrageous" as to merit the imposition of punitive liability. Nor has the majority directed our attention to any such evidence of that nature. There is just no evidence in the record that Saidel's action exhibited a reckless or callous disregard of, or indifference to, Feldman's rights. Nor is there any evidence that Saidel's conduct was outrageous. _See_ _Tunis Brothers Co. v. Ford Motor Co._, 952 F.2d 715, 739–40 (3d Cir. 1991).

Concededly, the record suggests that Saidel was made aware of Feldman's IAD reports.  There also is record evidence that Paone conferred with Saidel before firing Feldman, just as there is record evidence that Saidel concurred in Paone's decision to fire Feldman.[6]

---

[6] Saidel testified at his deposition as follows:

> Q: When you had the conversation with Mr. Paone regarding Mr. Feldman's firing did Mr. Paone ever say to you that he wanted Feldman fired for giving information to the HUD inspector general?
>
> A: If I'm not mistaken he mentioned to me that one of the things he felt was a problem was that . . . Mr. Feldman did not follow the chain of command.

App. VI at 1306.  At trial, Saidel testified as follows:
> Q: Do you recall discussing Mr. Feldman's firing with Mr. Paone before he was fired?
>
> A: I didn't discuss it with Mr. Paone.  Mr. Paone told me that he was contemplating dismissing Mr. Feldman.

App. VIII at 2238.  Paone testified as follows:
> A:  . . . I discussed the situation with Mr. Saidel based on the meeting that I had with Mr. Feldman and I told Mr. Saidel that I wanted to terminate Mr. Feldman, asked his concurrence, he concurred.
>
> Q: Did you actually terminate him that week?
>
> A: No.  I terminated him two weeks later, May 3d.
>
> Q: And what was the reason for the delay?

Discharging an employee, however, can be a neutral, non-discriminatory action. Here, there is no direct evidence that Saidel had knowledge of Paone's discriminatory motive in firing Feldman. Nor is there any direct evidence that Saidel concurred in Paone's decision because of his own personal discriminatory motive.

In Keenan v. City of Philadelphia, 983 F.2d 459 (3d Cir. 1992), we vacated the punitive damages awarded against Philadelphia's Police Commissioner even though we upheld the compensatory damages imposed against him. We held that even though Police Commissioner Tucker "had been fully aware of the actions of his subordinate command personnel in this particular case," this fact alone could not justify the imposition of punitive damages against him. Id. at 471.

This case is much the same as Keenan and highlights the rule that "despite its utility as a deterrent, the punitive damage remedy must be reserved . . . for cases in which the defendant's conduct amounts to something more than a bare

---

A: Well there's a number of reasons. We spent a day in Richmond, when I came back I talked to both Rich Brown who is the Director of Human Resources and Mr. Saidel again. Mr. Saidel had a concern that [objection omitted] . . . Mr. Saidel's concern was that there would be a perception because of Mr. Feldman's position in terminating an Internal Auditor that we should touch base with relevant Federal officials first.

App. VII at 1625-27.

violation justifying compensatory damages or injunctive relief." Cochetto v. Desmond, 572 F.2d 102, 106 (3d Cir. 1978).  See also Savarese, 883 F.2d at 1205 (3d Cir. 1989) (noting that "punitive damages in general represent a limited remedy, to be reserved for special circumstances").

Here, where there is only minimal evidence supporting Saidel's liability for compensatory damages, and no evidence which would tend to show that Saidel's actions were in any way "outrageous," I believe that the imposition of punitive damages against Saidel was inappropriate and should be vacated.


                              VI

In sum, I would reverse and remand to the district court with instructions that it order the reinstatement of Feldman at the same salary to the same position or an equivalent position to the one he previously held at PHA.  I would vacate the front pay award of $500,000 as inappropriate upon Feldman's reinstatement and alternatively as excessive under the circumstances of this case.  Finally, I would vacate the $10,000 award of punitive damages against Saidel.

I respectfully dissent from so much of the majority's opinion as holds otherwise.

f